*UNITED STATES DISTRICT COURT*
*DISTRICT OF MAINE*

| | | |
|---|---|---|
| *JONATHAN MARZOLL,* | ) | |
| | ) | |
| *Plaintiff* | ) | |
| | ) | |
| *v.* | ) | *Civil No. 08-261-B-S* |
| | ) | |
| *MARINE HARVEST US, INC., et al.,* | ) | |
| | ) | |
| *Defendants* | ) | |

*MEMORANDUM DECISION ON MOTION TO EXCLUDE AND*
*RECOMMENDED DECISION ON MOTIONS FOR SUMMARY JUDGMENT*

Defendants Cobscook Bay Salmon ("Cobscook Bay"), True North Salmon US, Inc. ("True North"), Phoenix Salmon US, Inc. ("Phoenix"), and New DHC, Inc. ("DHC") (collectively, the "Cobscook Bay Defendants") move to exclude the testimony of Dr. Lauren Hebert, an expert designated by plaintiff Jonathan Marzoll in this action for compensation for injuries and damages that the plaintiff allegedly suffered while employed as a crew member of the F/V *Jocelyn Marie*. *See* Cobscook Bay Salmon, True North Salmon US, Inc., Phoenix Salmon US, Inc., and New DHC, Inc.'s Motion To Exclude the Testimony of Dr. Lauren Hebert ("Motion To Exclude") (Docket No. 51) at 1; Second Amended Complaint and Demand for Jury Trial ("Amended Complaint") (Docket No. 22) ¶¶ 1-12.

In addition, (i) the plaintiff moves for partial summary judgment on his claims, (ii) defendant Marine Harvest US, Inc. ("Marine Harvest") moves for summary judgment as to the plaintiff's claims, as well as the Cobscook Bay Defendants' cross-claims, against it, and (iii) the Cobscook Bay Defendants move for summary judgment as to the plaintiff's claims against them. *See* Plaintiff Jonathan Marzoll's Motion for Partial Summary Judgment

1

("Plaintiff's S/J Motion") (Docket No. 48) at 1, 7; Defendant Marine Harvest US, Inc.'s Motion for Summary Judgment on Plaintiff's Claims ("Marine's S/J Motion/Plaintiff") (Docket No. 52) at 1; Defendant Marine Harvest [US], Inc.'s Motion for Summary Judgment on Co-Defendants' Cross-Claims ("Marine's S/J Motion/Cobscook") (Docket No. 53) at 1; Defendants Cobscook Bay Salmon, True North Salmon US, Inc., Phoenix Salmon US, Inc. and New DHC, Inc.'s Motion for Summary Judgment as to All Claims ("Cobscook's S/J Motion") (Docket No. 55) at 1.[1]

For the reasons that follow, I deny the motion to exclude and recommend that the court grant the plaintiff's motion for partial summary judgment, grant in part and deny in part Marine Harvest's motion for summary judgment as to the plaintiff's claims, grant Marine Harvest's motion for summary judgment as to the Cobscook Bay Defendants' cross-claims, and deny the Cobscook Bay Defendants' motion for summary judgment as to the plaintiff's claims.

## I.  Motion To Exclude

### A.  Applicable Legal Standard

Rule 702 provides:

If scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education, may testify thereto in the form of an opinion or otherwise, if (1) the testimony is based upon sufficient facts or data, (2) the testimony is the product of reliable principles and

---

[1] This action encompasses (i) the plaintiff's claims against Marine Harvest and the Cobscook Bay Defendants for Jones Act negligence, unseaworthiness, and maintenance and cure, *see* Amended Complaint, (ii) the Cobscook Bay Defendants' cross-claim against Marine Harvest for contribution or indemnification for any liability on their part to the plaintiff, *see* Crossclaim ("Cobscook Cross-Claim"), commencing on page 4 of Affirmative Defenses, Answer, and Crossclaim of Defendants Cobscook Bay Salmon, True North Salmon US, Inc., Phoenix Salmon US, Inc., and New DHC, Inc., to Plaintiff's Second Amended Complaint ("Cobscook Answer") (Docket No. 29), and (iii) the Cobscook Bay Defendants' third-party complaint against Carolina Capital Leasing, Inc. ("Carolina Capital"), *see* Cobscook Bay Salmon, True North Salmon US, Inc., Phoenix Salmon US, Inc., and New DHC, Inc.'s Third Party Complaint Against Carolina Capital Leasing, Inc. ("Third-Party Complaint") (Docket No. 33).  On July 16, 2009, the court granted a motion by the Cobscook Bay Defendants for an entry of default against Carolina Capital.  *See* Docket No. 44.

> methods, and (3) the witness has applied the principles and methods reliably to the facts of the case.

Fed. R. Evid. 702.  Under Rule 702, "it is the responsibility of the trial judge to ensure that an expert is sufficiently qualified to provide expert testimony that is relevant to the task at hand and to ensure that the testimony rests on a reliable basis."  *Beaudette v. Louisville Ladder, Inc*., 462 F.3d 22, 25 (1st Cir. 2006).  With respect to reliability:

> In *Daubert* [*v. Merrell Dow Pharms., Inc.*, 509 U.S. 579 (1993)], the Supreme Court set forth four general guidelines for a trial judge to evaluate in considering whether expert testimony rests on an adequate foundation: (1) whether the theory or technique can be and has been tested; (2) whether the technique has been subject to peer review and publication; (3) the technique's known or potential rate of error; and (4) the level of the theory or technique's acceptance within the relevant discipline.  However, these factors do not constitute a definitive checklist or test, and the question of admissibility must be tied to the facts of a particular case.

*Id.* (citations and internal quotation marks omitted); *see also, e.g., Zachar v. Lee*, 363 F.3d 70, 76 (1st Cir. 2004) ("The court's assessment of reliability is flexible, but an expert must vouchsafe the reliability of the data on which he relies and explain how the cumulation of that data was consistent with standards of the expert's profession.") (citation and internal quotation marks omitted).

As the First Circuit has observed, "*Daubert* does not require that the party who proffers expert testimony carry the burden of proving to the judge that the expert's assessment of the situation is correct."  *United States v. Mooney*, 315 F.3d 54, 63 (1st Cir. 2002) (citation and internal quotation marks omitted).  "It demands only that the proponent of the evidence show that the expert's conclusion has been arrived at in a scientifically sound and methodologically reliable fashion."  *Id*. (citation and internal quotation marks omitted).  That said, "nothing in either *Daubert* or the Federal Rules of Evidence requires a district court to admit opinion evidence which is connected to existing data only by the *ipse dixit* of the expert.  A court may

conclude that there is simply too great an analytical gap between the data and the opinion proffered." *Ruiz-Troche v. Pepsi Cola of P.R. Bottling Co.*, 161 F.3d 77, 81 (1st Cir. 1998) (citation and internal quotation marks omitted).

### B. Factual Background

The Cobscook Bay Defendants seek to exclude the testimony of the plaintiff's expert Lauren Hebert, DPT, OCS, owner and founder of SmartCare Physical Therapy in Dixfield Maine. *See* Motion To Exclude at 1; *Curriculum Vitae* of Lauren Andrew Hebert, DPT, OCS ("Hebert *CV*"), Hebert Dep. Exh. 1, attached to Deposition of Lauren Hebert, DPT, OCS ("Hebert Dep."), filed with Motion To Exclude, at [1].[2]

The plaintiff alleges that, on or about August 30, 2005, while engaged in the task of "dipping" salmon, one of his duties as a crewman of the F/V *Jocelyn Marie*, he suffered injuries and damages that included a serious, painful, and permanent physical injury to his back. *See* Amended Complaint ¶ 12. He engaged Dr. Hebert to perform an "assessment of work-related risk factors for this type of low back injury[.]" Work Risk Analysis Consultation Report re: Jonathan Marzoll dated March 13, 2009 ("Hebert Report"), Hebert Dep. Exh. 2, attached to Hebert Dep., at [1]. Specifically, Dr. Hebert was asked "to assess the work-related risk factors presented by dipping fish as described to me by and demonstrated to me [by the plaintiff] during my site visit to Eastport, Maine, on March 13, 2009[,]" "to give my opinion on whether the fish dipping task was unsafe in light of any observed risk factors and physical demands[,]" and "to give my opinion on whether [the plaintiff's] back injury was consistent with the risk factors and physical demands of dipping fish." Affidavit of Lauren Hebert, [DPT] ("Hebert Aff."), Exh. F to

---

[2] "DPT" is an apparent reference to "Doctor of Physical Therapy" and "OCS" to "Orthopedics Clinical Specialist." *See* Hebert *CV* at [1].

Plaintiff's Opposition to Defendant Cobscook Bay Salmon, et al.'s Motion To Exclude Testimony of Lauren Hebert, [DPT] ("Exclude Opposition") (Docket No. 68).

To prepare his report, Dr. Hebert:

1.      Reviewed medical reports regarding the plaintiff's back injury and diagnosis of an L4-5 central disc herniation with possible L5 nerve root impingement, leading to surgery on December 13, 2006, and later postoperative epidural scar formation. *See* Hebert Report at [1].

2.      Obtained the plaintiff's description of the "onset mechanics as dipping fish from a low pen, with a net weighing 10 pounds, requiring him to lift the net with 5 to 7 fish weighing 8 to 10 pounds each for a total of 50 to 70 pounds per lift, levering the load with an 8-foot-long net shaft held at pivot points 30 inches and 65 inches from the center of the loaded net, lifting that load from knee height to above shoulder height, twisting with that load, to tip the load onto the barge behind him." *Id*. The plaintiff stated that he performed two to three lifts per minute over a continuous two-and-half to three-hour period, with two interruptions. *See id*.

3.      Observed the plaintiff demonstrate the manner in which he performed the fish-dipping task, albeit without any salmon in the net, and took on-site measurements, for example of the height at which the plaintiff began and finished the lift, and the number of degrees that he twisted his torso to perform it. *See id*. at [1]-[2]. Dr. Hebert obtained a fishing net weight of 10 pounds from the plaintiff and from weighing a net provided to him by the plaintiff's counsel prior to the demonstration. *See* Hebert Dep. at 51-52. He did not weigh the net actually used in the demonstration. *See id*. at 52. Dr. Hebert obtained his estimate of the weight and number of the fish dipped from the plaintiff. *See id*. at 53. He did not independently verify that information. *See id*.

5

4.      Calculated the risks of the task using the NIOSH (National Institute for Occupational Safety and Health) Lifting Equation, which he describes as "the 'gold standard' for objectively calculating lifting-related injury risk."  Hebert Report at [1].  This calculation produced a Lifting Index score of 3.29 at the start of the lift and 8.33 at the end, judged "highly unsafe" in comparison with a safe listing task, defined by the NIOSH to have a Lifting Index score of 1.0 or less.  *See id.*

5.      Calculated the risks of the task using the "WISHA" Lifting Analysis, derived from the State of Washington Department of Labor and Industries Ergonomics Rule.  *See id.* at [2].  This calculation revealed a safe lifting limit for the task of 22.1 pounds, compared with the actual weight of 50 pounds lifted at the lower end of weight range the plaintiff described lifting.  *See id.*

Dr. Hebert described the NIOSH Lifting Equation as follows:

The NIOSH was developed in the 1980s by an ad hoc committee of researchers trying to tie together the various risk factors contributing potentially to low back problems so they could attempt a reproducible quantifiable yardstick for measuring the level of physical risk presented by lifting tasks. . . .  In the late 1980s, early 1990s, I believe it came out in 1991, they had another ad hoc committee seek to improve upon it and revise it to make it a bit more practical to use and to include [sic] a few errors of omissions that had been in the previous.

Hebert Dep. at 62-63.

The WISHA Lifting Analysis was developed by the State of Washington.  *See id.* at 37, 54.  It is a five-step calculation that applies weight lifted, lowest height lifted, horizontal distance lifted from the body, frequency of lifts, and twisting with the load.  *See* Hebert Report at [2]. The WISHA analysis produces a lifting limit for a given task and queries whether the weight lifted exceeds the lifting limit, in which case the task is deemed to pose a hazard.  *See id.* at [7].

Dr. Hebert used software to perform the NIOSH and WISHA calculations in this case. *See* Hebert Dep. at 64.  He trusted the accuracy of the software and did not double-check the calculations or ask anyone else to do so.  *See id.*

Dr. Hebert testified that there are limitations to use of the NIOSH and WISHA formulae, including that they measure only external demands placed on the worker, omitting to take into account the worker's body mechanics or flexibility, and they presuppose lifting with both hands rather than one hand.  *See id.* at 67-68.  The formulae also omit to capture certain data, for example, if a worker is lifting too high, too far, or too frequently to fit the mathematical model. *See id.* at 68.  To Dr. Hebert's knowledge, the NIOSH Lifting Equation has not been tested or subject to peer review in an aquaculture context.  *See id.* at 69.  He is unaware of any studies measuring the known or potential error rate for either the NIOSH or WISHA methodology.  *See id.* at 69-70.

In his report, Dr. Hebert stated that certain additional risk factors, not taken into account by the NIOSH or WISHA formulae, actually worsened the risk of the fish-dipping task, including (i) stance stability, given that the employee stands on PVC cylinders, creating an unstable surface with confined foot location options, (ii) the wearing of a bulky flotation suit, potentially impairing flexibility and adding resistance to movements, (iii) the plaintiff's report that he was a barge deckhand and was not generally accustomed to the task of fish dipping, for which he stated that he had not been trained, and (iv) the task component of reaching far forward with the net to direct the salmon closer.  *See* Hebert Report at [2].  At his deposition, Dr. Hebert testified that he could not quantify the additional risk factor of reaching far forward.  *See* Hebert Dep. at 61.

In his report, Dr. Hebert concluded:

> [T]his job task has numerous risk factors that make this task a very high risk for back injury, including lumbar disc damage. The injury described in the medical reports I examined is consistent with the stress of this job. The weight lifted, frequency of the lift[s], extremes of vertical load movement, extremes of horizontal load movement, extremes of twisting movement, all while loaded with the weight represent numerous hazardous work demands. This job, as described to me by the individual and as observed by me on this date, is unsafe in light of the observed risk factors and physical demands.

Hebert Report at [2].

On approximately 50 occasions prior to conducting the instant work risk analysis, Dr. Hebert has investigated particular work-related injuries. *See* Hebert Dep. at 36. None of those investigations involved aquaculture or fish dipping. *See id.* at 37.

In conducting a work risk analysis, Dr. Hebert normally follows the procedure of (i) asking the employee and/or supervisor to describe the nature of the work tasks, (ii) observing the performance of the work tasks, (iii) taking photographs to identify key issues, and (iv) taking appropriate measurements. *See id.* at 45. Dr. Hebert did not identify a treatise from which his method of work risk analysis is devised, but he testified that it is "a traditional way that all of those that I am aware of follow and what I teach in my courses." *Id.*

Dr. Hebert is not in a position to verify that an employee performed a task at the time of an injury in the same manner later described or demonstrated to him. *See id.* at 46. When he is provided divergent descriptions of the nature of a task, for example from an employee and a supervisor, he asks to observe other employees performing it. *See id.* at 48. In the plaintiff's case, Dr. Hebert did not ask to observe other employees performing the task or attempt to gather information from the employer about the task. *See id.* at 50-51. His task, as outlined by the plaintiff's attorney, was to measure what was demonstrated to him. *See id.* at 51.

Dr. Hebert agrees that it would potentially have an impact on his opinion if there were other contributing factors besides those described by the plaintiff that led to the plaintiff's low

back pain. *See id*. at 49. He agrees that musculoskeletal pain can have many sources unrelated to work. *See id*. He testified that "unless the job is obviously out of the realm of . . . safe definitions, the other factors[,] medical factors, health factors, nonoccupational stresses would be important." *Id*. If, hypothetically, a worker is engaged in other activities that are equally unsafe, Dr. Hebert cannot know whether the job-related task was the source of the injury as opposed to other sources. *See id*. at 50. He acknowledges that it would impact his calculations of the risk of the fish-dipping task if the information provided by the plaintiff as to the weight of the net, the weight and number of the fish, the duration and intensity of the task, and/or the mechanics of the lift were inaccurate. *See id*. at 53-55. He agrees with the statement that "it is difficult to try and prevent back injuries when no one really knows what causes that." *Id*. at 74.

Dr. Hebert agrees that psychosocial circumstances, such as potential for secondary gain, pain avoidance behavior, pain perception, disability perception, and the wide-ranging effects of stress, play a legitimate role in ergonomics assessment. *See id*. at 74-75. He did not ask the plaintiff about his relationship with his co-workers or overall happiness with life, instead focusing "purely on the task of the measurements." *Id*. at 77.

Dr. Hebert defines "ergonomics" as "the study of the physical requirements of work and its [e]ffect on the human body to carry out the work tasks." *Id*. at 11. Neither Maine, nor to Dr. Hebert's knowledge, any other governmental entity licenses or certifies ergonomists. *See id*. at 13-14. Rather, "ergonomics certification and licensing is a private label." *Id*. While ergonomics is not specifically licensed, it is considered part of a physical therapy practice scope. *See id*. at 26. Dr. Hebert is licensed as a physical therapist in the State of Maine. *See id*. It is possible to obtain a master's degree or doctorate in ergonomics, although Dr. Hebert has not done so. *See id*. at 14.

Dr. Hebert obtained a bachelor of science degree in physical therapy, *magna cum laude*, from the University of Vermont in 1974, undertook graduate studies in medical education at the University of Vermont from 1975-76, and obtained a Doctor of Physical Therapy degree from the University of New England in 2008. *See* Hebert *CV* at [1]. He is certified by the American Physical Therapy Association ("APTA") as an Orthopedics Clinical Specialist ("OCS") and holds an MSD Prevention and Ergonomics certification from IMPACC, an acronym for Injury Management Prevention and Cost Containment, an organization that he founded in 1983. *See id.*; Hebert Dep. at 20, 22-23. About 50 to 60 other individuals also are certified as ergonomists by IMPACC. *See* Hebert Dep. at 25. Hundreds are certified as ergonomists by a different entity, the Board of Certified Professional Ergonomists. *See id.* Ergonomics is encompassed within Dr. Hebert's OCS certification. *See id.* at 21. He has attended a number of post-graduate continuing education seminars, including several on the subject of ergonomics. *See* Hebert *CV* at [3]-[4].

Dr. Hebert has also taught the subject of ergonomics, serving as a lecturer on ergonomics for Purdue University Extension Office in 1992-93, providing various ergonomics seminars for the Maine Safety Council from 1988 to 1993, and serving as keynote speaker on ergonomics for the Maine Safety Conference in 1991, the New Hampshire Safety Conference in 1993, and the New Brunswick Safety Conference in 1993. *See id.* at [4]. He was lead seminar instructor for Northeast Seminars of Hookset, New Hampshire, from 1995 to 2001 on its "Work Injury Prevention and Ergonomics" seminar held throughout the United States. *See id.* at [1]. He has provided seminars on ergonomics quarterly throughout the United States and Canada on behalf of various medical and business groups from 1986 to the present, and provided seminars for physical therapy and occupational therapy professionals on work injury prevention and ergonomics on behalf of IMPACC from 1990 to the present. *See id.* at [4]. None of Dr. Hebert's

IMPACC workplace injury prevention programs has involved aquaculture companies or harvesting fish from oceanside pens.  *See* Hebert Dep. at 34.

Dr. Hebert has published books, videos, and multimedia programs for IMPACC and SmartCare, among them an ergonomic work risk analysis guide, *see* Hebert *CV* at [5], and has authored more than a dozen articles, including an article titled, "A New Look at Proper Lifting," published in the Journal of Occupational Health and Safety in 1987, *see id*. at [6].  None of Dr. Hebert's publications relates to the aquaculture industry or the mechanics of dipping fish.  *See* Hebert Dep. at 28.  Only one of his publications, which had nothing to do with ergonomics, has been peer-reviewed.  *See id*. at 29-30.

The Cobscook Bay Defendants retained their own expert ergonomist, Maureen Graves Anderson.  *See* Defendants Cobscook Bay Salmon, True North Salmon US, Inc., Phoenix Salmon US, Inc., and New DHC, Inc.'s Reply Memorandum to Plaintiff's Opposition to Defendants' Motion To Exclude Testimony of Lauren Hebert, [DPT] ("Exclude Reply") (Docket No. 83) at 1; Deposition of Maureen Graves Anderson ("Anderson Dep."), Exh. I to Exclude Opposition, at 1.  Anderson possesses a master's degree from the University of Idaho in "human factors psychology," a term sometimes used interchangeably with ergonomics, *see* Anderson Dep. at 11, 14, and is certified in ergonomics by the Board of Certified Professional Ergonomists, *see id*. at 25-26.  With the benefit of review of Dr. Hebert's report and the transcript of his deposition, *see id.* at 4, she testified, *inter alia*, that:

1.      The location of the plaintiff's injury is consistent with a work-related injury, and the dipping task could have contributed to it.  *See id*. at 85.  However, she had no opinion as to whether the plaintiff suffered a back injury dipping fish because she did not have enough information.  *See id*. at 24.  She agreed that if there were evidence that the plaintiff operated a

chain saw for a lengthy period of time or a weed whacker for hours at a time, holding it away from his body, those could be sources of his back injury as well. *See id*. at 99-100.

2. Dr. Hebert's report was "well-done" and competent, and she "would say he could work as an ergonomist." *Id*. at 30, 54. While Anderson did not double-check Dr. Hebert's figures, she eyeballed them to know that they were approximately right. *See id*. at 54. Dr. Hebert's calculations "looked valid" based on the photos he submitted with his report. *See id*. at 55; *see also id*. at 64 ("How he calculated his numbers [is] accurate."). It is acceptable ergonomic practice to use a computer to perform such calculations. *See id*. at 54.

3. The NIOSH Lifting Equation, which Anderson referred to as the "NIOSH Lifting Guide," is a tool generally used in the ergonomics field for evaluating lifting work tasks. *See id*. at 46. The NIOSH Lifting Equation can underestimate or overestimate the risk of a lift, depending on factors that the formula does not capture. *See id*. at 93. For example, "[i]f the footing is not safe, the NIOSH Lifting Guide may underestimate." *Id*. at 94. Although the NIOSH Lifting Equation is not a perfect tool, and does not present itself as such, it is "the best one we have" and "has widespread acceptance." *Id*. at 47.

4. When Anderson observed a different individual than the plaintiff demonstrate the fish-dipping task, she calculated, using the NIOSH Lifting Equation, a lifting index ranging from 1.35 to 3.66 for the task as performed by that individual. *See id*. at 61. However, she does not take exception to the conclusions reached in Dr. Hebert's report based on what Dr. Hebert observed the plaintiff do. *See id*. at 55-56. She testified, "Based on the photos I saw, they would lead you to that high lifting index." *Id*. at 57. She did question whether someone could perform the fish-dipping task for the length of time reported by the plaintiff, in the manner in which he performed it, because it would be too fatiguing. *See id*. at 85-86.

12

The numbers yielded by Dr. Hebert indicate that the job as performed by the plaintiff was risky for 90 percent of the male population.  *See id*. at 58.  The person whom Anderson observed demonstrating the fish-dipping task performed it "in a less risky manner" than had the plaintiff.  *Id*. at 71.  For example, the person whom Anderson observed did not lift the fish up directly over his head to the waiting barge, and he stated that the workers lifted only two to three fish at a time if the fish weighed 10 pounds at the time of the dip.  *See id*. at 72-73.

5. Anderson did not weigh the dipping net used in the demonstration she saw.  *See id*. at 67.  There were no fish in the net during the demonstration.  *See id*. at 77.  She relied on information provided by the individual demonstrating the task as to the total weight of the load, fish and net, and she took measurements.  *See id*. at 67-68.

## C.  Discussion

The Cobscook Bay Defendants challenge Dr. Hebert's testimony on five bases, arguing that (i) his methodology is unreliable, (ii) his methodology has not been peer-reviewed or tested, (iii) he is not properly qualified in the field of ergonomics, (iv) his opinions are based on insufficient facts and data, and (v) he did not account for obvious alternative explanations.  *See* Motion To Exclude at 2-9.

As the Cobscook Bay Defendants correctly observe, *see* Motion To Exclude at 1-2, Dr. Hebert's testimony bears on causation.  The plaintiff brings three claims, for Jones Act negligence, unseaworthiness, and maintenance and cure.  *See* Amended Complaint ¶¶ 13-16.  As to each, he bears the burden of establishing causation, albeit under differing standards.  *See, e.g*., *Napier v. F/V Deesie, Inc*., 454 F.3d 61, 64 n.1, 67-68 (1st Cir. 2006) (with respect to Jones Act claim of negligence, plaintiff must make "featherweight" showing "that the vessel's negligence played any part, even the slightest, in producing the injuries for which the plaintiff seeks

damages"; with respect to claim of unseaworthiness, plaintiff must show that an unseaworthy condition proximately caused his or her injuries; with respect to claim of maintenance and cure, plaintiff must show that his or her illness or injuries "occurred while in service of the ship").

Yet, it is important to bear in mind that Dr. Hebert does not express an opinion that the task of fish dipping caused, in whole or in part, the back injuries of which the plaintiff complains. He states, instead, that the fish dipping task, as described and demonstrated by the plaintiff, is unsafe and poses a very high risk for back injury, including lumbar disc damage, and that the plaintiff's injury as described in the medical reports is consistent with the stress of that task. *See* Hebert Report at [2]. The question presented is whether Dr. Hebert is qualified to express *that opinion* and whether he arrived at it by way of a reliable methodology and upon a sufficient factual foundation. For the following reasons, I conclude that the plaintiff has met his burden of showing that Dr. Hebert has.

### 1. Reliability of Methodology

As a threshold matter, the Cobscook Bay Defendants challenge the reliability of ergonomics as a field because it is unregulated and its practitioners are unlicensed. *See* Motion To Exclude at 2-3. They cite no authority for the proposition that a field of expertise must be subject to licensure or other regulation by a governmental authority to pass muster pursuant to *Daubert. See id*. The testimony of both Anderson and Dr. Hebert establishes that (i) ergonomics is an accepted field of study, and (ii) at least two organizations, the Board of Certified Professional Ergonomists and IMPACC, certify professionals in that field. At least one court has expressly rejected the assertion that the field of "experimental psychology and human factors

engineering" is a "junk science."  *See Whatley v. Merit Distribution Servs*., 166 F. Supp.2d 1350, 1355 (S.D. Ala. 2001).  I likewise decline to do so.[3]

The Cobscook Bay Defendants further assert that the NIOSH and WISHA formulae on which Dr. Hebert relied are flawed, citing three Occupational Safety Health Review Commission ("OSHRC") cases for the proposition that the NIOSH Lifting Equation is an unreliable methodology.  *See* Motion To Exclude at 3-4; *see also Secretary of Labor v. Dayton Tire*, 18 O.S.H. Cas. (BNA) 1225 (1998), 1998 WL 99288; *Secretary of Labor v. Pepperidge Farm, Inc.*, 17 O.S.H. Cas. (BNA) 1993 (1997), 1997 WL 212599; *Secretary of Labor v. Beverly Enters., Inc.*, Docket No. 91-3344, 92-0238, 92-0819, 92-1257, 93-0724, 1995 WL 693958 (OSHRC Nov. 13, 1995), *rev'd*, 19 O.S.H. Cas. (BNA) 1161 (2000), 2000 WL 34012177.

None of these cases helps the Cobscook Bay Defendants.  While, in *Dayton Tire*, the OSHRC did exclude certain testimony of two of the secretary's proffered ergonomics experts on the basis of use of unreliable methodologies, the "observational method" of identification of ergonomic stressors in the case of one expert and a "relative risk" statistical methodology in the case of the other, the OSHRC did not specifically address the reliability of either the NIOSH or WISHA lifting formulae that form the centerpiece of Dr. Hebert's opinions.  *See Dayton Tire*, 1998 WL 99288, at *17, *20, *22-*23.[4]

---

[3] In their reply brief, the Cobscook Bay Defendants cite and quote extensively from *Stasior v. National R.R. Passenger Corp.*, 19 F. Supp.2d 835 (N.D. Ill. 1998).  *See* Exclude Reply at 7-9.  However, *Stasior* does not stand for the propositions that ergonomics, as a field, produces unreliable testimony or that lifting risk-analysis formulae such as the NIOSH and WISHA formulae are unreliable.  The testimony at issue in *Stasior* concerned the asserted causal connection between occupational factors and carpal tunnel syndrome.  *See Stasior*, 19 F. Supp.2d at 848-52.

[4] One of the ergonomics experts whose case-specific testimony was excluded used the 1991 version of the NIOSH Lifting Equation to calculate a recommended weight limit for jobs with respect to which he identified lifting as a stressor.  *See Dayton Tire*, 1998 WL 99288, at *6.  However, as noted, the court addressed the reliability of his methodology for identifying such work stressors, not the reliability of his methodology for setting weight limits once stressors related to lifting had been identified.  *See id*. at *22-*23.

*Pepperidge Farm* likewise contains no ruling on the reliability of the NIOSH or WISHA lifting formulae. Although, in that case, Pepperidge Farm made an argument that a 1981 version of the NIOSH lifting formula could not be used to establish the existence of a lifting hazard, the OSHRC did not reach it. *See Pepperidge Farm*, 1997 WL 212599, at *11 n.27. In any event, Dr. Hebert used the most recent version of the NIOSH lifting formula as updated in 1991. *See* Hebert Dep. at 63.

Finally, while in *Beverly,* an OSHRC administrative law judge concluded that the 1991 version of the NIOSH Lifting Equation was too unreliable to support a finding that lifting practices at Beverly's nursing homes posed a significant risk to nursing assistants and other employees of developing low back pain, *see Beverly*, 1995 WL 693958, at *1-*3, *15-*16, the full OSHRC later reversed that decision, *see* 2000 WL 34012177, at *1-*2. In so doing, the OSHRC described the NIOSH Lifting Equation as "based on the generally accepted means of analyzing LBP [low back pain] and its risk factors[.]" *Id.* at *17. The OSHRC noted:

> The NIOSH equations [the 1981 and 1991 versions] rely on the data compiled by various researchers on the biomechanical, epidemiological, psychophysical and physiological bases for lower back pain and provide a means of analyzing lifting and loading jobs for their level of risk.
>
> ***
>
> The reason for the 1991 revision was to enable the equation to cover a larger range of duration and frequency of lifting as well as asymmetrical lifting where the load is not distributed evenly on either side of the body. Like the previous equation, the 1991 version uses a formula with multipliers for horizontal, vertical, and lift distance and for frequency – in addition to a factor to account for asymmetrical lifts – but substituted a single lifting index ("LI") for the earlier three-part formula. The LI is the ratio of the load lifted to the "recommended weight limit" of 3400 newtons.

*Id.* at *17 (citations omitted). The OSHRC observed: "While NIOSH recognized the difficulty of *quantifying* the degree of risk associated with measurements of the lifting index, NIOSH

nevertheless found sufficient evidence to indicate that the lifting criteria can reliably predict the risk of LBP." *Id.* at *18 (emphasis in original).

As both Anderson and Dr. Hebert acknowledge, quantifying the degree of risk of injury posed by a lifting task is a challenging endeavor, with a variety of occupational and non-occupational factors potentially contributing to an injury. Not all risk factors are captured by the NIOSH or WISHA lifting formulae, and it is difficult to see how they could be. Nonetheless, I am satisfied that the NIOSH Lifting Equation is a sufficiently reliable and widely accepted methodology to pass muster under *Daubert*. That it is not a perfect tool does not counsel its exclusion. As Anderson and Dr. Hebert indicated, it is the "gold standard": the best tool available for its intended purpose. A qualified ergonomist can explain why use of the tool overestimates or underestimates the risk of a given lifting task, as indeed Dr. Hebert did in this case. The limitations and weaknesses of use of the formula can be adequately addressed during both direct and cross-examination and grasped by a jury.[5]

### 2. Testing, Peer Review

The Cobscook Bay Defendants next challenge (i) reliance on the NIOSH standards because they have never been tested or peer-reviewed in the aquaculture context and (ii) reliance on both the NIOSH and WISHA formulae because there is no known or potential error rate for either, and both fail to take into account the full panoply of factors potentially contributing to injury, including worker behavior and level of strength and flexibility. *See* Motion To Exclude at 4-5.

---

[5] I treat the Cobscook Bay Defendants' first argument as pertaining to the NIOSH Lifting Equation. In that section of their brief, they offer no developed argumentation as to why or how the WISHA formula constitutes a flawed methodology. *See* Motion To Exclude at 2-4; *see also, e.g., Graham v. United States,* 753 F. Supp. 994, 1000 (D. Me. 1990) ("It is settled beyond peradventure that issues mentioned in a perfunctory manner, unaccompanied by some effort at developed argumentation are deemed waived.") (citation and internal quotation marks omitted).

In the circumstances presented, lack of peer review in an aquaculture context, lack of a known or potential error rate, and failure of the formulae to reflect the full universe of risk factors are not fatal to their reliability.  Lack of peer review of an expert's methodology does not in itself dictate exclusion of an opinion.  *See, e.g., Ruiz-Troche*, 161 F.3d at 84 ("neither publication nor peer review is a *sine qua non* of admissibility") (citation and internal quotation marks omitted); *see also Daubert*, 509 U.S. at 593 ("Publication (which is but one element of peer review) is not a *sine qua non* of admissibility; it does not necessarily correlate with reliability, and in some instances well-grounded but innovative theories will not have been published.  Some propositions, moreover, are too particular, too new, or of too limited interest to be published.") (citations omitted).

The NIOSH "found sufficient evidence to indicate that the lifting criteria can reliably predict the risk of LBP."  *Beverly*, 2000 WL 34012177, at *18.  The NIOSH and WISHA formulae are designed to calculate the risk of lifting tasks generally, across industries, by use of select data.  To the extent that the setting of the aquaculture industry or the manner in which the fish-dipping task is performed heighten or reduce lifting risks revealed by the formulae, direct and cross-examination can effectively reveal those anomalies.[6]

### 3.  Dr. Hebert's Qualifications

The Cobscook Bay Defendants next contend that Dr. Hebert is not properly qualified in the field of ergonomics, in that his expertise is mostly self-taught, he received an ergonomics

---

[6] *United States v. Green*, 405 F. Supp.2d 104 (D. Mass. 2005), which the Cobscook Bay Defendants cite in support of their argument that lack of a known or potential error rate counsels exclusion, *see* Motion To Exclude at 4, is distinguishable.  Rather than relying on a standardized formula, the proffered expert in that case relied primarily on comparison of bullet casing characteristics with gun characteristics that he remembered from previous examinations. *See Green*, 405 F. Supp.2d at 112.  He had not done "anything to systematize his own past experience."  *Id*.  "He never kept any written record of the characteristics of the guns he has examined[.]"  *Id*.

certification from an entity that he created, owned, and controlled, and he had never previously investigate the ergonomics of fish dipping from an ocean pen.  *See* Motion To Exclude at 5.

The challenge falls well short of the mark.  "It is not required that experts be blue-ribbon practitioners with optional [sic] certifications."  *United States v. Mahone*, 453 F.3d 68, 71 (1st Cir. 2006).  One "misunderstands *Daubert* to demand unassailable expert testimony."  *Mooney*, 315 F.3d at 63.  In addition to founding, managing, and receiving an ergonomics certification from IMPACC, Dr. Hebert has studied ergonomics, taught the subject in a variety of settings, and published books, articles, and other media on the topic.  He served as keynote speaker on ergonomics during several governmental safety conferences and has provided seminars on the subject throughout the United States and Canada.  Anderson judged the report he produced in the instant case to be competent, and she raised no issue with either its methodology or its conclusions, based on what Dr. Hebert had observed and been told.

That Dr. Hebert had not previously performed an analysis of fish dipping does not disqualify him to apply standardized formulae designed to measure lifting risks or to formulate an opinion concerning risk factors not taken into account in those formulae based on his extensive background and experience as an ergonomist, the information provided to him as to the fish-dipping task, and his own observation and measurements of that task.[7]

### 4.  Factual Basis of Opinion

The Cobscook Bay Defendants next assert that Dr. Hebert's opinion is based on insufficient facts or data because he (i) never weighed the net actually used by the plaintiff on the

---

[7] The Cobscook Bay Defendants cite *Silva v. American Airlines, Inc.*, 960 F. Supp. 528 (D.P.R. 1997), in support of their challenge to Dr. Hebert's qualifications.  *See* Motion To Exclude at 5.  The expert in that case, a civil engineer, was trained in safety aspects of public works, land surveying, and the building of highways, bridges, waterways, harbors, railroads, and airports, but offered an opinion as to the safety of an airplane's cabin design.  *See Silva*, 960 F. Supp. at 530-31.  Prior to writing his report in the case, the expert had no experience in the design, manufacturing, or operation of an aircraft.  *See id.* at 531.  In this case, by contrast, Dr. Hebert offers an opinion on a subject with respect to which he is qualified by his training and experience, that of the risk of a work-related lifting task.

date of the purported injury or the net used on the day of the demonstration, (ii) did not take into consideration the plaintiff's actual behavior on the date of the purported injury, including posture habits, flexibility, strength, and body mechanics, despite acknowledging the importance of such information, (iii) omitted to seek information as to how other employees used a dipping net, which he agreed would improve the accuracy of his analysis, (iv) did not insist that the plaintiff use a weighted net, full of fish, to demonstrate the task, (v) did not consider the possibility of the inaccuracy of the plaintiff's information as to the duration and intensity of the lifting, and (vi) did not question whether there were other reports of injuries while fish dipping. *See* Motion To Exclude at 6-7.

"As a general rule, the factual basis of an expert opinion goes to the credibility of the testimony, not the admissibility, and it is up to the opposing party to examine the factual basis for the opinion in cross-examination." *Brown v. Wal-Mart Stores, Inc.,* 402 F. Supp.2d 303, 308 (D. Me. 2005) (citations and internal quotation marks omitted). "It is only if an expert's opinion is so fundamentally unsupported that it can offer no assistance to the jury [that] such testimony [must] be excluded on foundational grounds." *Id.* (citations and internal quotation marks omitted).

The asserted factual deficiencies identified by the Cobscook Bay Defendants do not render Dr. Hebert's opinion fundamentally unsupported. Dr. Hebert was asked to assess the safety risk of a task as described and demonstrated by the plaintiff. He did so. Anderson expressed no misgivings as to the methodology he employed to make that assessment or the conclusion he reached based on the information demonstrated or otherwise provided to him. To the extent that the information provided to him may have been inaccurate or incomplete, or Dr. Hebert otherwise did not consider the full universe of risk factors, those asserted shortcomings

can be adequately aired on cross-examination and grasped by the jury.  *See, e.g., Crowe v. Marchand*, 506 F.3d 13, 18 (1st Cir. 2007) ("Objections of this type, which question the factual underpinnings of an expert's investigation, often go to the weight of the proffered testimony, not to its admissibility.  As such, these matters are for the jury, not for the court.  This is as it should be; the district court's gatekeeping function ought not to be confused with the jury's responsibility to separate wheat from chaff.") (citations and footnote omitted).[8]

### 5.  Alternative Explanations

The Cobscook Bay Defendants finally posit that Dr. Hebert's testimony should be excluded because he failed to account for obvious alternative explanations, for example, inaccuracy of the plaintiff's information, which they posit is suggested by his employer's asserted clean record free of any other reported fish-dipping injuries, and the possibilities that the injuries may have been sustained while the plaintiff was engaged in a lawn-care business or that psychosocial issues played some role, the plaintiff having commented to Dr. Hebert that he had some level of conflict with his co-workers.  *See* Motion To Exclude at 7-8.

These arguments, again, address the factual underpinnings of Dr. Hebert's opinion and go to its weight, not its admissibility.  *See, e.g., Crowe,* 506 F.3d at 18; *Wal-Mart*, 402 F. Supp.2d at 308.

---

[8] In *Bennett v. CSX Transp., Inc*., Civil Action No. 1:05-CV-839-JEC, 2006 WL 5249702 (N.D. Ga. Sept. 19, 2006), the court rebuffed a similar challenge to use of the NIOSH Lifting Equation.  In that case, the defendant's expert testified that several factors peculiar to the manner in which the plaintiff performed a lift undermined the plaintiff's expert's application of the formula to the facts of the case, specifically that the lift performed by the plaintiff was made in an allegedly restricted work space, the plaintiff's lift involved a horizontal push or pull at the same time as a vertical lift was performed, and the plaintiff was in an asymmetrical position when he performed the lift.  *Bennett*, 2006 WL 5249702, at *6.  The defendant's expert, however, conceded that the NIOSH Lifting Equation was a valid tool used within the field of biometrics to evaluate the safety of a lift.  *See id*.  The court rebuffed the challenge, observing, "the identification of issues associated with the alleged issues of a methodology that, in the abstract, is reliable should be accomplished on cross-examination – not by excluding a method as unreliable."  *Id*. at *7 (citation omitted).

For all of the foregoing reasons, the motion to exclude Dr. Hebert's testimony is **_DENIED_**.

## II.  Motions for Summary Judgment

### A.  Applicable Legal Standard

### 1.  Federal Rule of Civil Procedure 56

Summary judgment is appropriate only if the record shows "that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(c); *Santoni v. Potter*, 369 F.3d 594, 598 (1st Cir. 2004).  "A dispute is genuine if the evidence about the fact is such that a reasonable jury could resolve the point in the favor of the non-moving party."  *Rodríguez-Rivera v. Federico Trilla Reg'l Hosp. of Carolina*, 532 F.3d 28, 30 (1st Cir. 2008) (quoting *Thompson v. Coca-Cola Co.*, 522 F.3d 168, 175 (1st Cir. 2008)).  "A fact is material if it has the potential of determining the outcome of the litigation."  *Id.* (quoting *Maymi v. P.R. Ports Auth.*, 515 F.3d 20, 25 (1st Cir. 2008)).

The party moving for summary judgment must demonstrate an absence of evidence to support the nonmoving party's case.  *Celotex Corp. v. Catrett*, 477 U.S. 317, 325 (1986).  In determining whether this burden is met, the court must view the record in the light most favorable to the nonmoving party and give that party the benefit of all reasonable inferences in its favor.  *Santoni,* 369 F.3d at 598.  Once the moving party has made a preliminary showing that no genuine issue of material fact exists, the nonmovant must "produce specific facts, in suitable evidentiary form, to establish the presence of a trialworthy issue."  *Triangle Trading Co. v. Robroy Indus., Inc.*, 200 F.3d 1, 2 (1st Cir. 1999) (citation and internal punctuation omitted); Fed. R. Civ. P. 56(e).  "As to any essential factual element of its claim on which the nonmovant would bear the burden of proof at trial, its failure to come forward with sufficient evidence to

generate a trialworthy issue warrants summary judgment to the moving party." *In re Spigel*, 260 F.3d 27, 31 (1st Cir. 2001) (citation and internal punctuation omitted).

## 2.  Local Rule 56

The evidence that the court may consider in deciding whether genuine issues of material fact exist for purposes of summary judgment is circumscribed by the local rules of this district. *See* Loc. R. 56.  The moving party must first file a statement of material facts that it claims are not in dispute.  *See* Loc. R. 56(b).  Each fact must be set forth in a numbered paragraph and supported by a specific record citation.  *See id.*  The nonmoving party must then submit a responsive "separate, short, and concise" statement of material facts in which it must "admit, deny or qualify the facts by reference to each numbered paragraph of the moving party's statement of material facts[.]"  Loc. R. 56(c).  The nonmovant likewise must support each denial or qualification with an appropriate record citation.  *See id.*  The nonmoving party may also submit its own additional statement of material facts that it contends are not in dispute, each supported by a specific record citation.  *See id.*  The movant then must respond to the nonmoving party's statement of additional facts, if any, by way of a reply statement of material facts in which it must "admit, deny or qualify such additional facts by reference to the numbered paragraphs" of the nonmovant's statement.  *See* Loc. R. 56(d).  Again, each denial or qualification must be supported by an appropriate record citation.  *See id.*

Failure to comply with Local Rule 56 can result in serious consequences.  "Facts contained in a supporting or opposing statement of material facts, if supported by record citations as required by this rule, shall be deemed admitted unless properly controverted."  Loc. R. 56(f).  In addition, "[t]he court may disregard any statement of fact not supported by a specific citation to record material properly considered on summary judgment" and has "no independent duty to

search or consider any part of the record not specifically referenced in the parties' separate statement of fact." *Id.*; *see also, e.g., Sánchez-Figueroa v. Banco Popular de P.R.*, 527 F.3d 209, 213-14 (1st Cir. 2008).

## B. Plaintiff's S/J Motion

### 1. Factual Background

Defendant Marine Harvest elected not to file a response to the plaintiff's motion for partial summary judgment. *See* Letter dated September 25, 2009, from Peter W. Culley, Esq., to Linda Jacobson ("Marine's Letter") (Docket No. 70). Marine Harvest, therefore, is deemed to have admitted the plaintiff's statements of material facts to the extent supported by record citations as required by Local Rule 56. *See* Loc. R. 56(f). As between the plaintiff and the Cobscook Bay Defendants, the parties' statements of material facts, credited to the extent either admitted or supported by record citations in accordance with Local Rule 56, with disputes in cognizable facts resolved in favor of the Cobscook Bay Defendants as nonmovants, reveal the following relevant facts.

The plaintiff alleges that on or about August 30, 2005, while performing duties as a crewman of the vessel *Jocelyn Marie*, he suffered injuries and damages as a Jones Act seaman because of the negligence of his employer and/or because of an unseaworthy condition of the *Jocelyn Marie*. Plaintiff's Statement of Material Facts ("Plaintiff's SMF") (Docket No. 49) ¶ 1; Defendants Cobscook Bay Salmon, True North Salmon US, Inc., Phoenix Salmon US, Inc. and New DHC, Inc.'s Response to Plaintiff's Statement of Material Facts ("Cobscook's Opposing SMF/Plaintiff") (Docket No. 74) ¶ 1.[9] The plaintiff's employer in 2005 was Stolt Sea Farm

---

[9] The Cobscook Bay Defendants qualify this statement by clarifying that they admit only that the plaintiff has so alleged. *See* Cobscook's Opposing SMF/Plaintiff ¶ 1. They deny the truth of the allegation. *See id.*

Maine, Inc. ("SSF Maine").  *Id*. ¶ 2.[10]  SSF Maine changed its name to Cobscook Bay Salmon on

October 23, 2006, by filing articles of amendment with the Maine Secretary of State on that date.

*Id*. ¶ 3.  The Maine corporation known as Cobscook Bay Salmon is the same corporate entity

that, prior to October 23, 2006, was known as Stolt Sea Farm Maine, Inc.  *Id*. ¶ 4.

In 2005, Steve Wallace was the primary captain of the *Jocelyn Marie*.  *Id*. ¶ 5.  In 2005,

the plaintiff was the deckhand on the *Jocelyn Marie*.  *Id*. ¶ 6.  In 2005, there was no other

deckhand assigned to the *Jocelyn Marie* besides the plaintiff.  *Id*. ¶ 7.  The plaintiff's immediate

supervisor in 2005 was Wallace.  *Id*. ¶ 8.  In 2005, Wallace's immediate supervisor was Austin

Dinsmore.  *Id*. ¶ 9.  In 2005, Dinsmore's employer was SSF Maine.  *Id*. ¶ 10.[11]  In 2005,

Wallace's employer was SSF Maine.  *Id*. ¶ 11.[12]  In 2005, the *Jocelyn Marie* was owned by

Carolina Capital.  *Id*. ¶ 19.[13]

---

[10] The Cobscook Bay Defendants purport to qualify this statement, admitting that SSF Maine was the plaintiff's "nominal" employer but arguing that the plaintiff was "not necessarily" an SSF Maine employee for purposes of federal maritime law.  *See* Cobscook's Opposing SMF/Plaintiff ¶ 2.  As discussed below, the Cobscook Bay Defendants previously admitted without qualification that SSF Maine was the plaintiff's employer, and that admission remains binding.  On that basis, the qualification is disregarded.

[11] The Cobscook Bay Defendants qualify this statement, admitting that Dinsmore was a "nominal" employee of SSF Maine.  *See* Cobscook's Opposing SMF/Plaintiff ¶ 10.

[12] The Cobscook Bay Defendants qualify this statement, admitting that Wallace was a "nominal" employee of SSF Maine.  *See* Cobscook's Opposing SMF/Plaintiff ¶ 11.

[13] The Cobscook Bay Defendants purport to qualify this statement, asserting that while Carolina Capital remained the title owner of the vessel at the time of the plaintiff's injury, the vessel was "owned" by SSF through an arrangement with Carolina Capital.  *See* Cobscook's Opposing SMF/Plaintiff ¶ 19 (incorporating Defendants Cobscook Bay Salmon, True North Salmon US, Inc., Phoenix Salmon US, Inc. and New DHC, Inc.'s Statement of Additional Material Facts ("Cobscook's Additional SMF/Plaintiff"), commencing on page 7 of Cobscook's Opposing SMF/Plaintiff, ¶ 52; Telephonic Deposition of Shirley Roach-Albert ("Roach-Albert Dep."), attached to Defendants Cobscook Bay Salmon, True North Salmon US, Inc., Phoenix Salmon US, Inc. and New DHC, Inc.'s Response to Marine Harvest U.S., Inc.'s Statement of Material Facts ("Cobscook's Opposing SMF/Marine") (Docket No. 72), at 21).  The plaintiff denies this assertion, relying on citation to the Cobscook Bay Defendants' admission that the F/V *Jocelyn Marie* was owned by Carolina Capital and *leased* to SSF, which is now defendant Marine Harvest.  *See* Plaintiff's Reply Statement of Material Facts to Cobscook Bay's et al.'s Response to Statement of Facts ("Plaintiff's Reply SMF") (Docket No. 76) ¶ 52; Defendants Cobscook Bay Salmon, True North Salmon US, Inc., Phoenix Salmon US, Inc. and New DHC, Inc.'s Response to Request for Admissions ("Cobscook Admissions"), attached thereto, ¶ 16 (emphasis added).  Pursuant to Federal Rule of Civil Procedure 36(b), "[a] matter admitted under this rule is conclusively established unless the court, on motion, permits the admission to be withdrawn or amended."  Fed. R. Civ. P. 36(b).  Admissions are "appropriately considered on summary judgment[.]"  *Stow v. Horan*, No. 94-1102, 1994 WL 524997, at *4 (1st Cir. Sept. 27, 1994).  On that basis, the qualification is disregarded.

Cobscook Bay does not dispute that in August 2005, the plaintiff was a full-time deckhand on the barge, the *Jocelyn Marie*, and therefore was a seaman in the service of a vessel and a Jones Act seaman in that sense. *Id.* ¶ 24.[14] Cobscook Bay disputes the assertion that at "the time of his injuries" the plaintiff was a Jones Act seaman. *Id.* Cobscook Bay admits that the *Jocelyn Marie* was a "vessel" for purposes of the Jones Act and the general maritime law of unseaworthiness. *Id.* ¶ 26.

Dinsmore's employer used the *Jocelyn Marie* during 2005. *Id.* ¶ 28. As a crew member of the *Jocelyn Marie*, the plaintiff performed any tasks required to assist the vessel. *Id.* ¶ 29.[15] In 2005, Shirley Roach-Albert was the vice-president of the East Coast Operation for SSF. Cobscook's Additional SMF/Plaintiff ¶ 53; Roach-Albert Dep. at 8.[16] Roach-Albert was paid by SSF. Cobscook's Additional SMF/Plaintiff ¶ 54; Roach-Albert Dep. at 8.[17] As vice-president of the East Coast Operation for SSF, Roach-Albert was responsible for the farming activities that SSF Maine carried on in Eastport and Lubec, Maine. Cobscook's Additional SMF/Plaintiff ¶ 55; Roach-Albert Dep. at 9.[18]

Any pay increase for any of the Canadian or U.S. workers for whom Roach-Albert was responsible, including the plaintiff, had to "go through" Roach-Albert. Cobscook's Additional SMF/Plaintiff ¶ 56; Plaintiff's Reply SMF ¶ 56. The insurance coverage on the F/V *Jocelyn Marie* was obtained through another entity, Stolt Terminals and Tankers Group. *Id.* ¶ 57. SSF

---

[14] My recitation incorporates the Cobscook Bay Defendants' qualification.

[15] The Cobscook Bay Defendants qualify this statement, asserting that the record citation relied upon by the plaintiff indicates that he would have done virtually anything that the vessel required. *See* Cobscook's Opposing SMF/Plaintiff ¶ 29 (incorporating Cobscook's Additional SMF/Plaintiff ¶ 48); Plaintiff's Reply SMF ¶ 48.

[16] The plaintiff denies this, *see* Plaintiff's Reply SMF ¶ 53; however, I view the evidence in the light most favorable to the Cobscook Bay Defendants as nonmovants.

[17] The plaintiff denies this, *see* Plaintiff's Reply SMF ¶ 54; however, I view the evidence in the light most favorable to the Cobscook Bay Defendants as nonmovants.

[18] The plaintiff purports to qualify this statement, stating that Roach-Albert was vice-president of Stolt Sea Farm, Inc. Canada, *see* Plaintiff's Reply SMF ¶ 55, but his qualification is in the nature of a denial that Roach-Albert was employed by SSF. I view the evidence in the light most favorable to the Cobscook Bay Defendants as nonmovants.

Maine had to discuss with SSF estimated costs of repairs, other than routine operating costs, that needed to be done on the F/V *Jocelyn Marie*. *Id*. ¶ 58. SSF would have to budget any estimated costs of repairs besides routine operating costs. *Id*. ¶ 59. SSF substantially modified the F/V *Jocelyn Marie* by increasing her length, width, and tonnage as SSF was looking for more cost-efficient and better ways to run the salmon farms. *Id*. ¶ 60.[19]

Dinsmore believed that in 2005 he was employed by Marine Harvest and that Marine Harvest and SSF Maine were "part" of the same company. *Id*. ¶ 61.[20] Wallace believed that in 2005 he was employed by Marine Harvest. *Id*. ¶ 62.[21] In 2005, Roach-Albert was the supervisor of Dinsmore, the Maine marine manager. *Id*. ¶ 64.

## 2. Discussion

The plaintiff seeks summary judgment as to (i) that the *Jocelyn Marie* is a "vessel" and (ii) that, at the time of his alleged injuries, he was a Jones Act seaman employed by SSF Maine, which is now defendant Cobscook Bay, and therefore Cobscook Bay is the appropriate Jones Act defendant. *See* Plaintiff's S/J Motion at 1; Plaintiff's Reply to Cobscook Bay et al.'s Opposition to Motion for Partial Summary Judgment ("Plaintiff's S/J Reply") (Docket No. 75) at 1-2.

The Cobscook Bay Defendants concede, and Marine Harvest has chosen not to contest, that the *Jocelyn Marie* is a "vessel" and that the plaintiff was a "seaman" for purposes of the Jones Act in August 2005. *See* Marine's Letter; Defendants Cobscook Bay Salmon, True North Salmon US, Inc., Phoenix Salmon US, Inc., and New DHC, Inc.'s Memorandum in Opposition to Plaintiff Jonathan Marzoll's Motion for Partial Summary Judgment ("Cobscook's S/J

---

[19] The plaintiff qualifies this statement, pointing out that the portion of the Roach-Albert deposition cited does not state whether SSF or SSF Canada made the modifications. *See* Plaintiff's Reply SMF ¶ 60.
[20] My recitation incorporates the plaintiff's qualification.
[21] The plaintiff qualifies this statement, asserting that Wallace was a W-2 employee of SSF Maine in 2005. *See* Plaintiff's Reply SMF ¶ 62; Cobscook Admissions ¶ 10.

Opposition/Plaintiff") (Docket No. 73) at 2-3 & 6 n.3.  Summary judgment as to those points accordingly is appropriate.

The Cobscook Bay Defendants dispute that, at the time of his alleged injuries, the plaintiff was employed by SSF Maine, now Cobscook Bay, or that Cobscook Bay is the appropriate Jones Act defendant.  *See id* at 6-9.[22]

The Jones Act states that "[a] seaman injured in the course of employment . . . may elect to bring a civil action at law, with the right of trial by jury, against the employer."  46 U.S.C. § 30104.  The existence of an employer-employee relationship between the plaintiff and the defendant is essential to maintenance of a Jones Act negligence claim and presents a question of fact as to which the seaman-claimant bears the burden of proof.  *See, e.g., Stephenson v. Star-Kist Caribe, Inc*., 598 F.2d 676, 681 (1st Cir. 1979).

Although a seaman may bring a Jones Act claim against more than one employer, only one person, firm, or corporation may be held liable as a Jones Act employer for purposes of the employee's recovery.  *See, e.g., Cosmopolitan Shipping Co. v. McAllister*, 337 U.S. 783, 791 (1949); *Wolsiffer v. Atlantis Submarines, Inc*., 848 F. Supp. 1489, 1495 (D. Haw. 1994).  To determine that entity's identity, "[o]ne must look at the venture as a whole."  *Cosmopolitan*, 337 U.S. at 795.  "Such words as employer, agent, independent contractor are not decisive."  *Id*.  "No single phrase can be said to determine the employer."  *Id*.  Yet, the court "may not disregard the plain and rational meaning of employment and employer to furnish a seaman a cause of action against one completely outside the broadest lines or definitions" of those terms.  *Id*. at 791.

---

[22] The Cobscook Bay Defendants also dispute the date and circumstances of the plaintiff's alleged injury.  *See* Cobscook's S/J Opposition/Plaintiff at 4-6.  The plaintiff clarifies that he did not intend to seek summary judgment as to those matters.  *See* Plaintiff's S/J Reply at 2.

In determining the identity of a Jones Act employer, relevant factors include: (i) who controls the employee and the work he or she is performing, (ii) the amount of supervision, (iii) the amount and source of investment in the operation, (iv) the method of payment, and (v) the parties' understanding of the relationship. *See, e.g., Wheatley v. Gladden*, 660 F.2d 1024, 1026 (4th Cir. 1981); *see also Cosmopolitan*, 337 U.S. at 795 (relevant questions include: "Whose orders controlled the master and the crew?  Whose money paid their wages?  Who hired the crew?  Whose initiative and judgment chose the route and the ports?").

The Cobscook Bay Defendants posit that Marine Harvest, rather than Cobscook Bay Salmon, qualifies as the plaintiff's Jones Act employer in that:

1.      SSF, now Marine Harvest, retained the status of owner of the vessel due to its demise charter (also known as bareboat charter) from Carolina Capital even if, as suggested in separate filings with the court, it entered into an oral sub-charter of the vessel with SSF Maine. *See* Cobscook's S/J Opposition/Plaintiff at 8.

2.      SSF controlled the amounts that SSF Maine personnel were paid, was responsible for SSF Maine's farming activities in Eastport and Lubec, had control over non-routine vessel maintenance decisions, and budgeted the costs of non-routine maintenance and repair. *See id*.

3.      SSF had the right to revoke at will SSF Maine's use of the *Jocelyn Marie*. *See id*.

4.      Many, if not all, *Jocelyn Marie* crew members thought that they were employees of SSF or Marine Harvest, not SSF Maine. *See id*.  Dinsmore, head of Maine aquaculture operations in August 2005, reported directly to and was supervised by Roach-Albert of SSF, who was herself in charge of managing and supervising aquaculture operations in and around Eastport. *See id*.

As the plaintiff points out, *see* Plaintiff's S/J Reply at 3-4, the Cobscook Bay Defendants previously admitted without qualification that his employer in 2005 was SSF Maine, *see* Cobscook Admissions ¶ 1.  No motion has been made to withdraw or amend that admission, and it is thus conclusive for purposes of this motion.  *See* Fed. R. Civ. P. 36(b); *Stow*, 1994 WL 524997, at *4.  Had the Cobscook Bay Defendants wished to admit only that Cobscook Bay was the plaintiff's "nominal" employer, they could and should have done so upon being served the relevant request for admissions.

In any event, even assuming *arguendo* that the admission is not determinative of the matter, the Cobscook Bay Defendants have adduced insufficient evidence to generate a triable issue as to whether SSF was the plaintiff's employer for purposes of the Jones Act.  They introduce no evidence that SSF hired the plaintiff, paid him, directed his work, or had the power to fire him.  *See Reeves v. Mobile Dredging & Pumping Co.*, 26 F.3d 1247, 1253 & n.9 (3d Cir. 1994) ("The existence of the employment relationship is a question of fact, and the inquiry turns on the degree of control the alleged employer exerts over the employee. . . .  Some of the factors demonstrating control include payment, direction, supervision, and discretion to hire and fire.").

That SSF chartered the *Jocelyn Marie* from Carolina Capital and substantially modified the vessel, that it approved SSF Maine employees' pay raises and non-routine vessel repair costs, that Wallace and Dinsmore subjectively but inaccurately believed that they were employed by SSF, and that Dinsmore was supervised by Roach-Albert of SSF are not sufficient indicia of control upon which a reasonable trier of fact could deem SSF, rather than SSF Maine, to have been the plaintiff's "employer" in 2005.[23]  *See, e.g., Williams v. McAllister Bros. Inc.*, 534 F.2d

---

[23] While the Cobscook Bay Defendants state, in their brief, that SSF had the right to revoke at will SSF Maine's use of the *Jocelyn Marie*, *see* Cobscook's S/J Opposition/Plaintiff at 8, they introduce no such evidence, *see generally* Cobscook's Additional SMF/Plaintiff.

19, 21-22 (2d Cir. 1976) (observing that the "plain and rational meaning of employment and employer determines the availability of Jones Act coverage"; reasoning that it was doubtful that the appellant would have succeeded in showing that parent, rather than subsidiary, was his Jones Act employer on evidence that parent owned all of subsidiary's stock, subsidiary's key officers and directors were from the parent family, the subsidiary worked within the framework of the parent's policies, and the parent had to be informed of and concur in major repairs).

For the foregoing reasons, I recommend that the plaintiff's motion for partial summary judgment, as its parameters are clarified in his reply brief, be granted. If the court concurs, it will be deemed established that (i) the F/V *Jocelyn Marie* is a "vessel," (ii) the plaintiff was a seaman for purposes of the Jones Act in August 2005, and (iii) the plaintiff was employed at that time by SSF Maine, now Cobscook Bay, which is the appropriate Jones Act defendant.

## C. Marine's S/J Motion/Plaintiff

### 1. Factual Background

Marine Harvest's and the plaintiff's statements of material facts, credited to the extent either admitted or supported by record citations in accordance with Local Rule 56, with disputes in cognizable facts resolved in favor of the plaintiff as nonmovant, reveal the following relevant facts.

The plaintiff alleges that he injured his back while worked aboard the F/V *Jocelyn Marie* on or about August 30, 2005. Defendant Marine Harvest U.S., Inc.'s Statement of Material Facts ("Marine's SMF") (Docket No. 54) ¶ 1; Plaintiff's Opposing Statement of Material Facts

("Plaintiff's Opposing SMF/Marine") (Docket No. 62) ¶ 1.[24]  In August and September 2005, the plaintiff was employed by SSF Maine, now known as Cobscook Bay.  *Id.* ¶¶ 2, 9.

As of 1995, SSF and SSF Maine were part of a group of related companies engaged in various aquaculture activities throughout Canada and the United States.  *Id.* ¶ 10.  As an independent company, SSF Maine leased and operated salmon aquaculture farming facilities at various locations in Maine, including Johnson's Cove in Eastport, Maine.  *Id.* ¶ 11.  For purposes of this motion, SSF concedes that it leased a vessel known as the F/V *Jocelyn Marie* from Carolina Capital in 1997 pursuant to a bareboat charter.  *Id.* ¶ 12.  Carolina Capital remained the title owner of the vessel at the time of the plaintiff's injury.  *Id.* ¶ 13.

The lease agreement between SSF, now Marine Harvest, and Carolina Capital for the bareboat charter of the F/V *Jocelyn Marie* states, in pertinent part: "Without Lessor's prior written consent, Lessee shall not . . . (b) sublet or lend the Equipment, or c) permit the Equipment to be used by anyone other than Lessee or Lessee's employees."  Additional Facts ("Plaintiff's Additional SMF/Marine"), commencing on page 4 of Plaintiff's Opposing SMF/Marine, ¶ 57; Terms and Conditions of Lease ("Lease Agreement"), Roach-Albert Dep. Exh. 3, attached to Marine's SMF, ¶ 8.

Roach-Albert, as vice-president of Stolt Sea Farm Inc. Canada, "was responsible for the farming activities that Stolt Sea Farm Maine, Inc. carried on in Eastport and Lubec."  Plaintiff's Additional SMF/Marine ¶ 58; Roach-Albert Dep. at 6-7, 9.  At the time of the plaintiff's

---

[24] Marine Harvest submitted a single statement of material facts in support of its separate summary judgment motions as to the plaintiff's claims and the Cobscook Bay Defendants' cross-claims.  *See* Marine's SMF.  The plaintiff and the Cobscook Bay Defendants understandably responded to each of Marine Harvest's proffered statements.  *See* Plaintiff's Opposing SMF/Marine; Cobscook's Opposing SMF/Marine.  Nonetheless, certain of Marine's statements pertain only to its motion against the plaintiff, and others pertain solely to its motion against the Cobscook Bay Defendants.  I have set forth only such statements as are relevant to the motion in question.

accident, insurance on the F/V *Jocelyn Marie* was handled through the Stolt Terminals and Tankers Group.  Plaintiff's Additional SMF/Marine ¶ 59; Roach-Albert Dep. at 30.

By 2005, SSF Maine was using the F/V *Jocelyn Marie* to engage in the aquaculture operations authorized by its lease with the State of Maine.   Marine's SMF ¶ 14; Plaintiff's Opposing SMF/Marine ¶ 14.[25]   SSF provided the vessel to SSF Maine with no captain, crew, provisions, or equipment.  *Id*. ¶ 15.  Upon acquiring custody of the F/V *Jocelyn Marie* from SSF, SSF Maine equipped and manned the vessel.  *Id*. ¶ 16.  No SSF employees dictated where, when, or how the F/V *Jocelyn Marie* would operate.  *Id*. ¶ 17.  The captain and the entire crew of the F/V *Jocelyn Marie* were SSF Maine employees.  *Id*. ¶ 18.  SSF Maine selected, hired, and trained the crew of the F/V *Jocelyn Marie*.  *Id*.[26]

SSF Maine assumed exclusive and complete responsibility for all maintenance and repairs to the vessel, including what, when, and how maintenance, such as oil changes and fluid checks, would be performed.  *Id.* ¶ 19.  All costs in connection with the operation of the F/V *Jocelyn Marie* were borne by SSF Maine, including costs of fuel and mooring.  *Id*. ¶ 20.  SSF Maine had total control over where, when, and how the vessel was operated, *i.e*., location, hours per day, days per week, months per year, and weather conditions.  *Id*. ¶ 21.  Other than having discussions with SSF Maine about budgeting issues associated with non-routine repairs, SSF had no involvement in the operation or management of the F/V *Jocelyn Marie*.  *Id*. ¶ 22.  SSF Maine had to discuss non-routine operating and repair costs for the vessel with SSF for budgeting

---

[25] My recitation incorporates the plaintiff's qualification.
[26] I omit Marine Harvest's further assertion that SSF Maine paid the crew, *see* Marine's SMF ¶ 18, which is neither admitted, *see* Plaintiff's Opposing SMF/Marine ¶ 18, nor clearly supported by the citation given, *see* Roach-Albert Dep. at 35-38.   The plaintiff qualifies paragraph 18, asserting that any pay raises for SSF Maine employees, including the plaintiff, had to "go through" Roach-Albert.  *See* Plaintiff's Opposing SMF/Marine ¶ 18; Roach-Albert Dep. at 16-17.

purposes, and those costs were assigned within the "Stolt Group."   Plaintiff's Additional SMF/Marine ¶ 60; Roach-Albert Dep. at 36.

The plaintiff was hired in 1996 and was eventually promoted to work aboard the F/V *Jocelyn Marie*.  Marine's SMF ¶ 23; Plaintiff's Opposing SMF/Marine ¶ 23.  Over the following years, the plaintiff was promoted to the positions of maintenance man and deckhand.  *Id.* ¶ 24.  As of August 2005, the plaintiff was working as a deckhand aboard the F/V *Jocelyn Marie* and was employed by SSF Maine.  *Id.*

On or about August 30, 2005, SSF Maine navigated the F/V *Jocelyn Marie* to its aquaculture operation at Johnson Cove.  *Id.* ¶ 26.  Once on site, Wallace, the vessel's captain, requested that the plaintiff "dip" fish from salmon cages so that they could be brought on board the vessel to be sampled or measured.  *Id.*  In issuing the request, Wallace was acting at the direction of Dinsmore.  *Id.*  As of 2005, Wallace and Dinsmore were both employees of SSF Maine.  *Id.* ¶ 27.  Dinsmore was Maine marine manager for SSF Maine in 2005 in charge of Maine operations, and his supervisor was Roach-Albert.  Plaintiff's Supplement to Additional Facts ("Plaintiff's Supplemental SMF") (Docket No. 67) ¶ 61; Deposition of Austin Dinsmore ("Dinsmore Dep."), attached to Cobscook's Opposing SMF/Marine, at 9.[27]

To carry out his job of "dipping" the fish, the plaintiff leaned over a railing and, using a five- to six-foot-long dip net that was kept on the F/V *Jocelyn Marie*, scooped up multiple loads of fish from a fish pen and transferred them to the F/V *Jocelyn Marie*.  Marine's SMF ¶ 28; Plaintiff's Opposing SMF/Marine ¶ 28.  SSF did not own, select, or provide the dip net that the

---

[27] Although Local Rule 56 does not contemplate the filing of a supplement to a statement of additional facts, *see* Loc. R. 56, the plaintiff's supplement was filed only two days after his statement of additional facts and one day prior to expiration of his deadline for responding to Marine Harvest's Motion, *see* Docket Nos. 52, 62, 67.  Marine Harvest could have responded to it, but chose not to file a reply or objection to any of the plaintiff's statements of additional facts.  Accordingly, I have taken it into consideration.

plaintiff used.  *Id*. ¶ 29.  A typical scoop-full of fish weighed between 40 and 70 pounds.  *Id*. ¶ 30.  The plaintiff "dipped" fish in this manner using SSF Maine's net for two-and-a-half to three hours and completed his workday without incident.  *Id*. ¶ 31.[28]

The plaintiff claims that the following morning he awoke with significant back and leg pain.  *Id*. ¶ 32.  On the day the injury occurred, the plaintiff did not complain to any of his co-workers or superiors.  *Id*. ¶ 33.  The following morning at work, the plaintiff told his co-worker, Wallace, that his back was sore, but he did not mention any link between the alleged soreness and his job.  *Id*. ¶ 34.  The plaintiff later told Wallace that he was scheduled for an MRI exam sometime in February 2006.  *Id*. ¶ 35.  Again, the plaintiff did not mention that the injury was related to his job.  *Id*. ¶ 36.  Only later, after receiving the results of the MRI exam and near the time of his surgery, did the plaintiff tell his employer that his injury was suffered while working.  *Id*. ¶ 38.  The plaintiff underwent back surgery in December 2006 and, to this day, complains of back pain and physical limitations.  *Id*. ¶ 39.

### 2.  Discussion

Marine Harvest seeks summary judgment as to the plaintiff's Jones Act negligence, unseaworthiness, and maintenance and cure claims on the ground that it cannot be held legally responsible, as a matter of law, for any of those claims.  *See* Marine's S/J Motion/Plaintiff at 1, 5-6.  Its motion "raises the narrow issue of which entity can legally be held responsible for Plaintiff's injuries."  *Id*. at 5.  For the reasons that follow, I agree with Marine Harvest that, on the record presented, it cannot be held liable as a matter of law on the plaintiff's Jones Act and

---

[28] The plaintiff qualifies this statement, asserting that by the time he finished dipping he was experiencing pain in his buttocks and down his leg that was not normal work pain.  Plaintiff's Reply SMF/Marine ¶ 31; Marzoll Dep. at 15-16.

maintenance and cure claims.  However, I conclude that the plaintiff raises a triable issue as to Marine Harvest's potential liability on his unseaworthiness claim.

### a.  Unseaworthiness Claim

Vessel owners have "an absolute duty . . . to furnish a seaworthy ship and compensate seamen for injuries caused by any defect in a vessel or its appurtenant appliances or equipment." *Napier*, 454 F.3d at 67-68 (citations and internal quotation marks omitted).  Only one party, either a legal owner of a vessel or an owner *pro hac vice*, can be held liable for a vessel's unseaworthiness.  *See, e.g., McAleer v. Smith*, 57 F.3d 109, 112 (1st Cir. 1995).  Although the duty to provide a seaworthy ship cannot be delegated from an owner to a non-owner, "ownership" for liability purposes may be transferred from one entity to another.  *See, e.g., id*.  If a legal title owner of a vessel enters into a bareboat charter, or a demise charter, with another entity, the chartering entity becomes the owner *pro hac vice* and "stands in the place of the [title] owner for the voyage or service contemplated and bears the [title] owner's responsibilities, even though the latter remains the legal owner of the vessel."  *Id*. (citation and internal quotation marks omitted).

A bareboat charter agreement does not need to be reduced to writing.  *See, e.g., Banks v. Chas. Kurz Co.*, 69 F. Supp. 61, 65-66 (E.D. Pa. 1946), *recon. denied*, 69 F. Supp. 1017 (E.D. Pa. 1947).  In determining whether a given arrangement constitutes a bareboat charter, the inquiry focuses on the level of control exercised by the putative charterer.  *See, e.g, Guzman v. Pichirilo*, 369 U.S. 698, 700 (1962); *Deal v. A. P. Bell Fish Co*., 674 F.2d 438, 440-41 (5th Cir. 1982).  "To create a demise the owner of the vessel must completely and exclusively relinquish possession, command, and navigation thereof to the demisee."  *Guzman*, 369 U.S. at 699 (citations and internal quotation marks omitted).  "It is therefore tantamount to, though just short

36

of, an outright transfer of ownership." *Id*. at 700. "However, anything short of such a complete transfer is a time or voyage charter party or not a charter party at all." *Id*. "In final legal analysis, it is well-settled, whether the charter constitutes a demise depends upon whether the management and control of the vessel are in the hands of the charterer." *Banks*, 69 F. Supp. at 66.

When a vessel is transferred to another entity pursuant to a new bareboat charter, the original chartering party is no longer the owner *pro hac vice* and, thus, cannot be liable for an alleged unseaworthy condition. *See, e.g., Hamilton v. Canal Barge Co*., 395 F. Supp. 978, 989 (E.D. La. 1975).

For purposes of the instant motion, Marine Harvest does not dispute that it leased the F/V *Jocelyn Marie* from Carolina Capital pursuant to a bareboat charter. *See* Marine's S/J Motion/Plaintiff at 9-10. However, it asserts that it ceded complete control and operation of the vessel to SSF Maine, which accordingly is the only entity that can be held liable to the plaintiff for any unseaworthy condition. *See id*. at 10. It notes, for example, that it transferred the vessel to SSF Maine without any crew, SSF Maine exclusively selected the crew, SSF Maine selected and provided the dip net that allegedly rendered the vessel unseaworthy, and SSF Maine had exclusive control over the vessel's itinerary and exclusive power to decide where, when, and how to operate the vessel. *See id*.

The plaintiff counters that there is a triable issue as to whether Marine Harvest or SSF Maine was the bareboat charterer at the time of the alleged injury given that:

1.     The lease agreement expressly prohibited such a sub-demise without Carolina Capital's prior written consent. *See* Plaintiff's Memorandum in Opposition to Defendant Marine Harvest[] US, Inc.'s Motion for Summary Judgment ("Plaintiff's S/J Opposition/Marine")

37

(Docket No. 60) at 4.  In the absence of evidence that Marine Harvest obtained such written consent, it is asking the court to enforce a sub-demise not permitted by contract to the detriment of a third party.  *See id*. (citing *Baker v. Raymond Int'l, Inc*., 656 F.2d 173, 182 (5th Cir. 1981)).

2.  Roach-Albert had to approve all raises, including that of the plaintiff, in 2005. *See id*. at 5.  In the plaintiff's view, this is evidence that SSF Maine did not have the requisite control for the court to find a sub-demise.  *See id*. at 4-5.

3.  The plaintiff has adduced sufficient evidence to raise a question of fact as to whether crew members of the *Jocelyn Marie* were acting solely for the benefit of SSF Maine, namely, that (i) Roach-Albert claimed responsibility for farming activities in Eastport and Lubec, (ii) all non-routine operating costs had to be discussed with SSF before SSF Maine could incur them, (iii) those costs were "assigned within the 'Stolt Group[,]' suggesting not that [SSF Maine] paid all costs but that money for such non-routine costs came from other corporate entities including Marine Harvest[,]" (iv) insurance for the *Jocelyn Marie* was handled by Stolt Terminals and Tankers Group, and (v) Roach-Albert supervised SSF Maine's Dinsmore.  *See id*. at 5-6; Plaintiff's Supplement to Memorandum in Opposition to Defendant Marine Harvest US, Inc.'s Motion for Summary Judgment (Docket No. 66).

4.  Any sub-demise between SSF and SSF Maine for use of the *Jocelyn Marie* apparently was unsupported by consideration and, hence, is unenforceable.  *See* Plaintiff's S/J Opposition/Marine at 6.

5.  From all that appears, no period of time was specified for the asserted sub-demise, a fact that, in the plaintiff's view, seriously undermines Marine Harvest's argument that such a sub-demise existed because Marine Harvest could have revoked the arrangement at will.  *See id*. (citing *Turner v. Niagara Frontier Transp. Auth.*, 748 F. Supp. 80, 83 (W.D.N.Y. 1990)).

As Marine Harvest rejoins, *see* Defendant Marine Harvest US, Inc.'s Reply to Plaintiff's Opposition to Motion for Summary Judgment ("Marine's S/J Reply/Plaintiff") (Docket No. 81) at 2-5, the first and fourth points miss the mark. The plaintiff adduces no evidence that he was an intended beneficiary of the lease agreement between Carolina Capital and SSF or the agreement between SSF and SSF Maine concerning use of the *Jocelyn Marie*. He therefore lacks standing to complain that the *Jocelyn Marie* was demised to SSF Maine in violation of the lease agreement or without adequate consideration. *See, e.g., F. O. Bailey Co. v. Ledgewood, Inc.*, 603 A.2d 466, 468 (Me. 1992) ("An incidental beneficiary cannot sue to enforce third party beneficiary rights. In order to proceed as third party beneficiaries on a contract theory, plaintiffs must generate a genuine issue of material fact on the issue of Woodman's intent that they receive an enforceable benefit under the contracts. The intent must be clear and definite."); *United States ex rel. Valders Stone & Marble, Inc. v. C-Way Constr. Co.*, 909 F.2d 259, 266 (7th Cir. 1990) (noting, in context of admiralty case, that "[w]hether someone is an intended beneficiary of a contract between others always depends upon the particular contract and the particular circumstances").[29]

Nonetheless, and while the question is close and the plaintiff's counter-evidence thin, I conclude that he adduces sufficient evidence to raise a triable issue as to whether Marine Harvest is liable for any unseaworthy condition that existed aboard the *Jocelyn Marie* and caused his injuries in August 2005.

---

[29] Moreover, *Baker*, which the plaintiff cites for the proposition that SSF entered into a prohibited sub-demise, *see* Plaintiff's S/J Opposition/Marine at 4, is distinguishable. In *Baker*, the sub-demise in question contravened a federal regulation prohibiting demise or bareboat charters to aliens. *See Baker*, 656 F.2d at 182. Hence, "[a]ny attempted bareboat charter between Raymond and RSA [an alien corporation] was void ab initio; a court cannot enforce an illegal contract to the detriment of an innocent third party." *Id.* Even assuming *arguendo* that a sub-demise of the *Jocelyn Marie* was accomplished without Carolina Capital's written approval, there is no evidence that it was "illegal."

Marine Harvest adduces considerable evidence, much of it undisputed, militating in favor of a finding that, as of 2005, SSF turned over not only possession of the *Jocelyn Marie* to SSF Maine but also substantial control over her operations. Nonetheless, and particularly in the absence of any written agreement encapsulating the arrangement between SSF and SSF Maine with regard to the *Jocelyn Marie*, a reasonable trier of fact could conclude that Marine Harvest fails to satisfy the demanding test set forth in *Guzman,* namely, that it "completely and exclusively relinquish[ed] possession, command, and navigation" of the *Jocelyn Marie* to SSF Maine through a transaction "tantamount to, though just short of, an outright transfer of ownership." *Guzman*, 369 U.S. at 699-700 (citations and internal quotation marks omitted). The burden on Marine Harvest to prove the sub-demise "is heavy, for courts are reluctant to find a demise when the dealings between the parties are consistent with any lesser relationship." *Id*. at 700.

A reasonable trier of fact crediting the plaintiff's evidence could conclude that SSF, now Marine Harvest, did not *completely* relinquish command of the *Jocelyn Marie* to SSF Maine given indicia of SSF's ongoing interest in the *Jocelyn Marie* venture, including:

1.      The vesting of responsibility in Roach-Albert for farming operations in Eastport and Lubec, Maine, which one reasonably could infer included those of the *Jocelyn Marie*. *See* Plaintiff's Additional SMF/Marine ¶ 58; Roach-Albert Dep. at 6-7, 9.

2.      Roach-Albert's approval of pay raises for SSF Maine employees. *See* Plaintiff's Opposing SMF/Marine ¶ 18; Roach-Albert Dep. at 16-17.

3.      Roach-Albert's supervision of Dinsmore of SSF Maine. *See* Plaintiff's Supplemental SMF ¶ 61; Dinsmore Dep. at 9.

40

4.    The requirement that SSF Maine discuss non-routine operating costs with SSF before incurring them, coupled with SSF's budgeting of such non-routine costs.  *See* Plaintiff's Additional SMF/Marine ¶ 60; Roach-Albert Dep. at 36.

In addition, as the plaintiff points out, *see* Plaintiff's S/J Opposition/Marine at 6, Marine Harvest adduces no evidence that the purported sub-demise was for any particular term.  In the circumstances, I agree with the plaintiff that a reasonable trier of fact could infer that the arrangement between the two entities was revocable at will by SSF, again suggesting at least a modicum of continuing control by SSF over the *Jocelyn Marie* venture.  *See, e.g., Turner*, 748 F. Supp. at 83 (defendant did not carry heavy burden of showing demise in face of evidence of its continued inspections of vessel, its right to use vessel at any time, and the fact that it availed itself of that right).

For these reasons, Marine Harvest falls short of showing entitlement to summary judgment as to the plaintiff's unseaworthiness claim.

### b.  Jones Act Negligence and Maintenance and Cure Claims

Marine Harvest seeks summary judgment as to the plaintiff's Jones Act negligence and maintenance and cure claims on the bases that (i) only a seaman's employer can be held responsible for such claims, and (ii) the parties have admitted that SSF Maine was the plaintiff's employer.  *See* Marine's S/J Motion/Plaintiff at 11-12; *see also, e.g., Cerqueira v. Cerqueira*, 828 F.2d 863, 865 (1st Cir. 1987) ("[plaintiff] can succeed on his Jones Act and 'maintenance and cure' claims only if [defendant] employed him").

The plaintiff concedes that SSF Maine employed him.  *See* Plaintiff's S/J Opposition/Marine at 6.  However, he asserts that there are genuine issues of material fact as to whether SSF Maine and SSF constituted a single entity and a single employer under an

"integrated enterprise" theory.  *See id*. at 6-7 (citing *Romano v. U-Haul Int'l*, 233 F.3d 655 (1st Cir. 2000)).

Marine Harvest contends, and my research corroborates, that the "integrated enterprise" theory has not been applied in the context of Jones Act negligence and maintenance and cure claims.  *See* Marine's S/J Reply/Plaintiff at 8 n.3.  Instead, in this context, courts have considered whether one corporation was a "mere instrumentality" of the other.  *See id*.; *see also, e.g.*, *Williams*, 534 F.2d at 20-21 (to show that parent corporation was appellant's employer for Jones Act purposes, appellant had to "prove that [the subsidiary that nominally employed him] was a 'mere instrumentality' of [the parent], i.e., that [the parent] actually dominates [the subsidiary] such that the subsidiary has no existence of its own and that [the parent] uses the corporate existence of [the subsidiary] to perpetrate a fraud, resulting in an unjust loss to the claimant").

The plaintiff's evidence that Roach-Albert approved pay raises for *Jocelyn Marie* crew, that Roach-Albert was responsible for sea farming operations in Lubec and Eastport, Maine, that Roach-Albert supervised Dinsmore, that SSF Maine had budgeting discussions with SSF concerning the cost of non-routine repairs, that those costs were assigned within the Stolt Group, and that a different Stolt entity than SSF handled insurance for the *Jocelyn Marie* fall short of raising a triable issue as to whether SSF Maine was a mere instrumentality of SSF.  *See, e.g., id*. at 22 (it was "doubtful" that appellant would have succeeded in showing that subsidiary was mere instrumentality of parent when operational decisions such as vessel maintenance, crewing, the movement of vessels, and the negotiation of customer contracts were made solely by

subsidiary, even though subsidiary worked within framework of parent's policies and parent had to be informed of and concur in major repairs).[30]

For the foregoing reasons, I recommend that Marine Harvest's motion for summary judgment as to the plaintiff's claims be granted with respect to his Jones Act and maintenance and cure claims, but denied with respect to his unseaworthiness claim.

### D. Marine's S/J Motion/Cobscook

### 1. Factual Background

Marine Harvest's and the Cobscook Bay Defendants' statements of material facts, credited to the extent either admitted or supported by record citations in accordance with Local Rule 56, with disputes in cognizable facts resolved in favor of the Cobscook Bay Defendants as nonmovants, reveal the following relevant facts.

The plaintiff alleges that he injured his back while worked aboard the F/V *Jocelyn Marie* on or about August 30, 2005. Marine's SMF ¶ 1; Cobscook's Opposing SMF/Marine ¶ 1.[31]  In August and September 2005, the plaintiff was employed by SSF Maine. *Id.* ¶ 2.[32]

Cobscook Bay was incorporated in Maine as GFB-2, Inc., on January 31, 1995. *Id.* ¶ 3. On June 8, 1997, it changed its name to International Aqua Foods USA, Inc. Marine's SMF ¶ 4;

---

[30] Even if the "integrated enterprise" test were applicable, the plaintiff would not stave off summary judgment under that rubric. To succeed on an "integrated enterprise" claim, a plaintiff must prove by a preponderance of the evidence that each of two defendants was his or her employer, considering the defendants' interrelationship of operations, common management, centralized control of labor relations, and common ownership. *See Romano*, 233 F.3d at 665-666. The First Circuit places "particular emphasis on the interrelation of employment decisions[,]" following a "flexible" approach that "focuses on employment decisions, but only to the extent that the parent exerts an amount of participation that is sufficient and necessary to the total employment process, even absent total control or ultimate authority over hiring decisions." *Id.* at 666 (citation and internal punctuation omitted). While Roach-Albert approved pay raises, the record indicates that SSF Maine otherwise solely controlled employment decisions, including selection, hiring, training, and provision of equipment to the crew.

[31] The Cobscook Bay Defendants purport to deny this statement; however, they admit that the plaintiff so alleges. *See* Cobscook's Opposing SMF/Marine ¶ 1. They deny that the plaintiff's injury did in fact occur while he was working aboard the F/V *Jocelyn Marie* on or about August 30, 2005, *see id*; however, that denial is not relevant to the instant motion.

[32] The Cobscook Bay Defendants qualify this statement, asserting that they admit that SSF Maine was the plaintiff's "nominal" employer. *See* Cobscook's Opposing SMF/Marine ¶ 2.

Defendants' Answers to Interrogatories Propounded by Defendant Marine Harvest USA, LLC ("Cobscook Interrog. Ans."), Exh. B thereto, ¶ 1.[33]  On July 28, 2004, International Aqua Foods USA, Inc. changed its name to Stolt Sea Farm Maine, Inc., *i.e.*, SSF Maine.  Marine's SMF ¶ 5; Cobscook's Opposing SMF/Marine ¶ 5.  As of 2005, SSF Maine was a Maine corporation.  *Id.* ¶ 6.  In 2005, SSF was a Delaware corporation.  *Id.* ¶ 7.  On December 21, 2005, SSF changed its name to Marine Harvest US, Inc., *i.e.*, Marine Harvest.  *Id.* ¶ 8.  On October 23, 2006, SSF Maine changed its name to Cobscook Bay Salmon, *i.e.*, Cobscook Bay.  *Id.* ¶ 9.[34]

As of 1995, SSF and SSF Maine were part of a group of related companies engaged in various aquaculture activities throughout Canada and the United States.  *Id.* ¶ 10.  SSF Maine leased and operated salmon aquaculture farming facilities at various locations in Maine, including Johnson's Cove in Eastport, Maine.  *Id.* ¶ 11.  For purposes of this motion, SSF concedes that it leased a vessel known as the F/V *Jocelyn Marie* from Carolina Capital in 1997 pursuant to a bareboat charter.  *Id.* ¶ 12.  Carolina Capital remained the title owner of the vessel at the time of the plaintiff's injury.  *Id.* ¶ 13.

On January 6, 2009, the plaintiff filed this action for unseaworthiness, maintenance and cure, and Jones Act negligence against Marine Harvest (as successor to SSF), Cobscook Bay (as successor to SSF Maine), and several of Cobscook Bay's related entities, True North, Phoenix, and DHC.  *Id.* ¶ 42.[35]  Between October and December 2005, SSF negotiated with Horton's of Maine, Inc. ("Horton's"), now True North, to sell the assets and liabilities of SSF Maine to

---

[33] The Cobscook Bay Defendants purport to deny this statement; however, their denial is unsupported by a record citation.  *See* Cobscook's Opposing SMF/Marine ¶ 4.

[34] My recitation incorporates the Cobscook Bay Defendants' qualification.

[35] The Cobscook Bay Defendants qualify this statement, asserting that the plaintiff filed his initial action for unseaworthiness, maintenance and cure, and Jones Act negligence against SSF and Cooke Aquaculture US, Inc. on August 7, 2008, and that the complaint described by Marine Harvest is his second amended complaint.  *See* Cobscook's Opposing SMF/Marine ¶ 42; Complaint and Demand for Jury Trial (Docket No. 1); First Amended Complaint and Demand for Jury Trial (Docket No. 4).

Horton's.  *Id.* ¶ 43.[36]  In December 2005, SSF Maine was sold to Horton's as part of a Share

Asset and Purchase Agreement ("Purchase Agreement").  *Id.*  The closing date of the Purchase

Agreement is December 15, 2005.  *Id.* ¶ 44.  The Purchase Agreement was signed by the

following parties: Marine Harvest Canada, Inc. and Marine Harvest as vendors and Cooke

Aquaculture, Inc. ("Cooke"), Kelly Cove Aquaculture Ltd. ("Kelly"), and Horton's, the latter

two parties as purchasers.  *Id.* ¶ 45.[37]

Today, Cooke retains the same name; Kelly is now known as Kelly Cove Salmon, Ltd.;

and Horton's is now known as True North.  *Id.* ¶ 46.  Of the four defendants pursuing a cross-

claim against Marine Harvest, only True North, as Horton's, was a party to the Purchase

Agreement.  *Id.* ¶ 47.[38]  The Cobscook Bay Defendants have asserted their cross-claims

exclusively under the terms of the Purchase Agreement.  Marine's SMF ¶ 48; Cobscook Interrog.

Ans. ¶ 5.[39]

---

[36] My recitation incorporates the Cobscook Bay Defendants' qualification.

[37] I have corrected Marine Harvest's typographical error of referring to Cooke as "Cook."  *See* Purchase Agreement, Exh. B to Cobscook's Opposing SMF/Marine.

[38] The Cobscook Bay Defendants purport to qualify this statement, but their qualification is in the nature of a legal argument, that while only True North was a direct party to the agreement, the other cross-claimants were each third-party beneficiaries of the agreement.  *See* Cobscook's Opposing SMF/Marine ¶ 47.  As it happens, this argument is not raised in their opposing brief or otherwise developed, *see generally* Cobscook's S/J Opposition/Marine, and hence is deemed waived, *see, e.g., Graham,* 753 F. Supp. at 1000.

[39] The Cobscook Bay Defendants purport to deny this statement, pointing without explanation to the same answer to interrogatories cited by Marine Harvest as well as to their cross-claim itself.  *See* Cobscook's Opposing SMF/Marine ¶ 48.  The cross-claim sheds no light on the bases for the claimed rights to contribution or indemnification.  *See* Cobscook Cross-Claim.  In their interrogatory answer, the only basis for the cross-claims identified besides the Purchase Agreement is the following: "Moreover, because [the plaintiff's] employer at the time of the alleged injury, Stolt, remains in business under the corporate name Marine Harvest, Horton's and its affiliated companies may not have succeeded to any Jones Act liability on the part of Stolt under the rationale provided by the court in Cox v. Roth, 348 U.S. [207,] 208-10 (1955)."  Cobscook Interrog. Ans. ¶ 5.  In *Cox,* the Supreme Court construed the Federal Employers' Liability Act ("FELA"), as applied in the context of the Jones Act, to permit suit against the administrator of the estate of a deceased vessel owner.  *See Cox,* 348 U.S. at 207 ("The main question presented in this case is whether an action under the Jones Act survives the death of the tortfeasor.").  In so doing, the Court observed, "Congress fully provided for the corporate analogues of death when it provided that suit might continue against the receiver or successor corporation of the railroad."  *Id.* at 209.  *Cox* makes clear that Marine Harvest remains directly liable to the plaintiff to the same extent as its predecessor, SSF, would have been.  However, *Cox* seemingly has no bearing on the question of Marine Harvest's liability for contribution to, or indemnification of, *third parties* found directly liable to the plaintiff.  The Cobscook Bay Defendants' opposing brief sheds no light on
(continued on next page)

The Purchase Agreement, at Schedule 1.1.56, established the transfer of certain employees from vendors to purchasers, including the plaintiff. *Id.* ¶ 49. Related to this transfer of employees, the Purchase Agreement, at section 4.1, outlines the assumption of liabilities by the purchasers, including present-day True North, which include "all costs and liabilities" related to the transferred employees. Marine's SMF ¶ 50; Purchase Agreement § 4.1.[40] With listed exceptions, section 8.1 of the Purchase Agreement imposes a two-year time limit on all representations and warranties made by the vendors. Marine's SMF ¶ 51; Cobscook's Opposing SMF/Marine ¶ 51.[41] This two-year time limit is measured from December 15, 2005, the closing date of the Purchase Agreement. *Id.* ¶ 52.[42]

Cobscook Bay, True North, Phoenix, and DHC brought their cross-claims on January 23, 2009, more than two years after the closing date of the Purchase Agreement. *Id.* ¶ 53. In September 2006, Marine Harvest and Marine Harvest Canada commenced an arbitration against Cooke, Kelly, and Horton's relating to issues arising from the Purchase Agreement. *Id.* ¶ 55. Under the terms of the Settlement Release dated November 30, 2007, Horton's, now True North, released Marine Harvest from "any and all claims, actions, causes of action, debts, accounts,

---

the matter, omitting any reference to *Cox* as a basis for avoidance of summary judgment. *See generally* Cobscook's S/J Opposition/Marine. The underlying statement accordingly is not effectively controverted.

[40] The Cobscook Bay Defendants deny this statement, asserting that the agreement speaks for itself. *See* Cobscook's Opposing SMF/Marine ¶ 50. They identify no respect in which the statement is inaccurate, *see id.*, and I find none, *see* Purchase Agreement § 4.1. In setting forth Marine Harvest's statement prior to responding to it, the Cobscook Bay Defendants introduced an error, misquoting the Purchase Agreement as referring to "all *hidden* costs and liabilities." *Compare* Marine's SMF ¶ 50 *with* Cobscook's Opposing SMF/Marine ¶ 50 (emphasis added). That misquotation is not present in Marine Harvest's underlying statement. *See id.*

[41] The Cobscook Bay Defendants qualify this statement, asserting that the agreement speaks for itself. *See* Cobscook's Opposing SMF/Marine ¶ 51. They identify no respect in which the statement is inaccurate, *see id.*, and I find none, *see* Purchase Agreement § 8.1.

[42] The Cobscook Bay Defendants qualify this statement, asserting that the agreement speaks for itself. *See* Cobscook's Opposing SMF/Marine ¶ 52. They identify no respect in which the statement is inaccurate, *see id.*, and I find none, *see* Purchase Agreement §§ 1.1.12, 8.1.

contracts, interest, damages, costs or expenses whatsoever, incurred prior to or in connection with the transactions contemplated by the [Purchase Agreement.]"  *Id.* ¶ 56.[43]

## 2. Discussion

Marine Harvest seeks summary judgment as to the Cobscook Bay Defendants' cross-claim against it for contribution or indemnification to the extent that any of them is found liable on the plaintiff's claims.  *See* Marine's S/J Motion/Cobscook at 1; Cobscook Cross-Claim. Marine Harvest posits that (i) the Cobscook Bay Defendants' cross-claims are predicated entirely on the terms of the Purchase Agreement, (ii) only True North, through its predecessor Horton's, is a party to that agreement, (iii) the agreement does not support True North's cross-claims for indemnification or contribution because any liability in this case is the responsibility of True North as an assumed liability, and (iv) True North and Marine Harvest signed a settlement release that defeats True North's cross-claims.  *See* Marine's S/J Motion/Cobscook at 5-10.

The Cobscook Bay Defendants rejoin, in relevant part, that:

1.      If the court determines that a genuine issue of material fact exists as to the identity of the owner of the *Jocelyn Marie* or of the plaintiff's Jones Act employer, it would be premature to decide whether Cobscook Bay is liable under the doctrine of corporate successor liability.  *See* Memorandum in Opposition by Defendants Cobscook Bay Salmon, True North Salmon US, Inc., Phoenix Salmon US, Inc., and new DHC, Inc. to Cross-Claim Defendant Marine Harvest US, Inc.'s Motion for Summary Judgment ("Cobscook's S/J Opposition/Marine") (Docket No. 71) at 10.

---

[43] The Cobscook Bay Defendants qualify this statement, asserting that the Settlement Release speaks for itself.  *See* Cobscook's Opposing SMF/Marine ¶ 56.  They identify no respect in which the statement is inaccurate, *see id.*, and I find none, *see* Settlement Release, Exh. C to Marine's SMF, ¶ 10.

2.      Marine Harvest failed to provide notice pursuant to Federal Rule of Civil Procedure 44.1 that it intended to raise an issue of foreign law, namely, that the Purchase Agreement should be construed in accordance with Canadian law.  *See id*. at 10-12.

3.      The Purchase Agreement, by its plain language, did not contemplate that True North would assume responsibility for liabilities of Marine Harvest incurred prior to December 15, 2005, including the plaintiff's claims.  *See id*. at 12.

4.      The Settlement Release applied only to claims "incurred prior to or in connection with the transactions contemplated by the [Purchase Agreement]."  *Id*. at 13.  The plaintiff's claims did not exist in November 2007 or at any time prior to that date.  *See id*.

5.      The Jones Act does not permit a maritime employer to exempt itself from liability by contract.  *See id*. at 13-14; *see also id*. at 8.

6.      By raising a dispute as to the interpretation of the Purchase Agreement in this proceeding, Marine Harvest has triggered that agreement's arbitration clause, and a definitive interpretation would have to be made through arbitration as specified in Article 13 of that agreement. *See id*. at 14.[44]

### a.  Collateral Points

Before reaching the merits of Marine Harvest's contentions, I consider the collateral points that the Cobscook Bay Defendants contend forestall summary judgment.

1.      <u>Consideration of Motion Premature</u>.  As a threshold matter, I reject the Cobscook Bay Defendants' suggestion that consideration of the instant motion is premature.  The motion

---

[44] The Cobscook Bay Defendants also argue at some length that Marine Harvest was the owner *pro hac vice* of the *Jocelyn Marie* and the plaintiff's Jones Act employer under theories, *inter alia*, that SSF Maine was an "instrumentality" of Marine Harvest.  *See* Cobscook's S/J Opposition/Marine at 3-10, 14-15.  As Marine Harvest observes, *see* Defendant Marine Harvest U.S., Inc.'s Reply Memorandum in Support of Its Motion for Summary Judgment on Co-Defendants' Cross-Claims ("Marine's S/J Reply/Cobscook") (Docket No. 84) at 1, these arguments have no bearing on the bases for its motion for summary judgment.  Hence, I have not considered them.

does not hinge on whether any of the Cobscook Bay Defendants ultimately is found liable on the plaintiff's claims.  Marine Harvest argues that regardless of that outcome, in view of the language of the Purchase Agreement and the Settlement Release, it cannot be held liable for indemnification or contribution to the Cobscook Bay Defendants.  *See* Marine's S/J Motion/Cobscook at 1.  That issue is ripe for adjudication.

2.  <u>Fed. R. Civ. P. 44.1</u>.  The Cobscook Bay Defendants' contention that Marine Harvest failed to provide notice pursuant to Federal Rule of Civil Procedure 44.1 is equally unavailing.  Rule 44.1 provides, in relevant part: "A party who intends to raise an issue about a foreign country's law must give notice by a pleading or other writing."  Fed. R. Civ. P. 44.1.  Marine Harvest gave such notice *via* its motion for summary judgment.  *See* Marine's S/J Motion/Cobscook at 8-9 (arguing that Purchase Agreement must be construed in accordance with Canadian law); *see also, e.g., Canadian Imperial Bank of Commerce v. Saxony Carpet Co*., 899 F. Supp. 1248, 1253 (S.D.N.Y. 1995), *aff'd*, 104 F.3d 352 (2d Cir. 1996) ("Plaintiff CIBC raised the issue of Quebec law in its motion papers, thereby giving notice under Rule 44.1.").

To the extent that the Cobscook Bay Defendants argue that Maine law, rather than Canadian law, applies, *see* Cobscook's S/J Opposition/Marine at 11-12, there is no appreciable difference between the two as to the points for which Marine Harvest cites Canadian law.  *Compare* Marine's S/J Motion/Cobscook at 8-9 (stating that, under Canadian law, "[w]ords of ordinary use in a contract must be construed in their ordinary and natural sense" and that "the golden rule is that the literal meaning must be given to the language of the contract, unless this would result in an absurdity") (citations and internal quotation marks omitted) *with, e.g., Reliance Nat'l Indem. v. Knowles Indus. Servs., Corp*., 2005 ME 29, ¶ 24, 868 A.2d 220, 228 ("Interpretation of an unambiguous [contract] provision is a matter of law, and the provision is

49

given its plain, ordinary, and generally accepted meaning.") (citation and internal quotation marks omitted).  I will assume, without deciding, that Maine law applies.

3.      Jones Act as Bar.  The Cobscook Bay Defendants rely on *Bay State Dredging & Contracting Co. v. Porter*, 153 F.2d 827, 832 (1st Cir. 1946), for the proposition that the Jones Act, by virtue of incorporation of a FELA provision, 45 U.S.C. § 55, bars a contractual transfer of employee-related liability such as that set forth in the Purchase Agreement.  *See* Cobscook's S/J Opposition/Marine at 13-14.[45]  As Marine Harvest points out, *Bay State* is distinguishable in that, there, the court considered the validity of a release executed by an injured seaman in favor of his employer, not a transfer of liability between two contracting parties, neither of whom was a seaman.  *See* Marine's S/J Reply/Cobscook at 5-6; *Bay State*, 153 F.2d at 832.  In any event, the Jones Act does not necessarily bar even a seaman's release of liability, if fair.  *See Bay State*, 153 F.2d at 832.  Assuming *arguendo* that True North's agreement to assume certain of Marine Harvest's liabilities with respect to transferred employees is the type of agreement even implicated by the FELA prohibition, the Cobscook Bay Defendants articulate no manner in which that agreement was or is unfair to the plaintiff.  They accordingly fail to make a persuasive case that the Purchase Agreement's negotiated transfer of liabilities runs afoul of the Jones Act.

4.      Triggering of Arbitration Clause.  The Cobscook Bay Defendants contend that, by raising a dispute as to the interpretation of the Purchase Agreement, Marine Harvest has triggered application of the agreement's arbitration clause.  *See* Cobscook's S/J Opposition/Marine at 14.  They reason: "[T]o the extent Marine Harvest urges an interpretation of the [Purchase Agreement] that is different than the one advanced by Cobscook Bay, including

---

[45] The FELA provision in question, made applicable to Jones Act cases by 46 U.S.C. § 30104, states, in relevant part: "Any contract, rule, regulation, or device whatsoever, the purpose or intent of which shall be to enable any common carrier to exempt itself from any liability . . . shall to that extent be void[.]"  45 U.S.C. § 55.

True North, then the arbitration clause of the [Purchase Agreement] controls, and a definitive interpretation would have to be made through arbitration as specified in Article 13." *Id*. Marine Harvest rejoins that the Cobscook Bay Defendants waived their right to invoke arbitration. *See* Marine's S/J Reply/Cobscook at 6-7.

"Federal policy strongly favors arbitration, but parties are not free to invoke arbitration rights at any time or under any circumstances." *In re Citigroup, Inc.*, 376 F.3d 23, 26 (1st Cir. 2004) (citation omitted). "A party may waive arbitration expressly or implicitly " *Id*. To the extent that the Cobscook Bay Defendants suggest that Marine Harvest must invoke arbitration, they are mistaken. Marine Harvest can choose to waive its own right to arbitration and clearly has done so.

To the extent that the Cobscook Bay Defendants seek to invoke their right to arbitration, I agree with Marine Harvest that they have implicitly waived it, having chosen to file their cross-claim, which was predicated on language in the Purchase Agreement, on January 23, 2009. *See* Cobscook Cross-Claim; Cobscook Interrog. Ans. ¶ 5. They cannot be heard to raise the possibility of arbitration of any dispute over that language months later, after the close of discovery and in response to the filing of a motion for summary judgment. *See Citigroup*, 376 F.3d at 26 (factors relevant to determining whether party has waived arbitration right include "[1] whether the party has actually participated in the lawsuit or has taken other action inconsistent with his right, . . . [2] whether the litigation machinery has been substantially invoked and the parties were well into preparation of a lawsuit by the time an intention to arbitrate was communicated by the defendant to the plaintiff, [and] . . . [3] whether there has been a long delay in seeking the stay or whether enforcement of arbitration was brought up when trial was near at hand") (citation and internal quotation marks omitted).

### b.  Merits of Marine Harvest's Argument

Marine Harvest seeks summary judgment as to three of the four Cobscook Bay Defendants, Cobscook Bay, Phoenix, and DHC, on grounds that (i) the Cobscook Bay Defendants identify no basis for their claims of contribution and indemnification other than the Purchase Agreement, and (ii) only True North was a party to that agreement and therefore has standing to assert it.  *See* Marine's S/J Motion/Cobscook at 5-6.  The Cobscook Bay Defendants raise no triable issue as to either point, entitling Marine Harvest to summary judgment with respect to the contribution and indemnification claims of those three entities.

With respect to True North, Marine Harvest correctly argues that the Purchase Agreement does not support a cross-claim for contribution or indemnification.  *See id*. at 6-9.  This is so because:

1.     The Purchase Agreement provided: "There are *no liabilities, whether or not accrued or contingent and whether or not determined or determinable*, in respect of the Purchased Business for which the Purchasers may become liable on or after consummation of the transactions contemplated by this Agreement *other than the Assumed Liabilities* and any liabilities arising from matters disclosed in the Schedules hereto."  Purchase Agreement § 6.1.7 (emphasis added).[46]

2.     The Purchase Agreement, at Schedule 1.1.56, established the transfer of certain employees from vendors to purchasers, including the plaintiff.  *See* Marine's SMF ¶ 49; Cobscook's Opposing SMF/Marine ¶ 49.

---

[46] Marine Harvest neglected to quote this provision in its statement of material facts, *see generally* Marine's SMF, an omission that normally would prove fatal to its consideration by the court, *see, e.g*., Loc. R. 56(f).  However, because Marine Harvest quoted the section on which it relies in its brief, *see* Marine's S/J Motion/Cobscook at 7, the court has been provided a copy of the underlying agreement, and the Cobscook Bay Defendants have not protested the oversight, *see* Cobscook's S/J Opposition/Marine at 12, I have taken it into consideration.

3.      Pursuant to section 4.1 of the Purchase Agreement, titled "Assumption of Liabilities," the purchasers agreed to assume, "as and from the Effective Time . . . all costs and liabilities . . . regarding all Transferred Employees[.]"  Purchase Agreement § 4.1(a).  The "Effective Time" is defined as the closing date.  *See id.* § 1.1.18.[47]

4.      With listed exceptions, section 8.1 of the Purchase Agreement imposes a two-year time limit on all representations and warranties made by the vendors.  *See* Marine's SMF ¶ 51; Cobscook's Opposing SMF/Marine ¶ 51.  This two-year time limit is measured from December 15, 2005, the closing date of the Purchase Agreement.  *See id.* ¶ 52.

5.      The Cobscook Bay Defendants brought their cross-claims on January 23, 2009, more than two years after the closing date of the Purchase Agreement.  *See id.* ¶ 53.

The Cobscook Bay Defendants assert that the agreement by Horton's, now True North, to assume certain liabilities "as and from the Effective Time" plainly indicates that Horton's did not agree to assume liabilities that existed prior thereto.  *See* Cobscook's S/J Opposition/Marine at 12.  They argue that because the plaintiff claims to have been injured in August 2005, prior to the Effective Time of December 15, 2005, the Purchase Agreement did not contemplate the purchasers' assumption of that liability.  *See id.*

This argument strains the plain meaning of the parties' agreement, which contemplated that the purchasers would assume "*no liabilities, whether or not accrued or contingent and whether or not determined or determinable*, in respect of the Purchased Business for which the Purchasers may become liable on or after consummation of the transactions contemplated by this

---

[47] The Cobscook Bay Defendants neglected to set these provisions forth in their statement of additional material facts, *see generally* Cobscook's Additional SMF/Marine, an omission that normally would prove fatal to their consideration by the court, *see, e.g.*, Loc. R. 56(f).  However, because the Cobscook Bay Defendants quoted or described the provisions in their brief, *see* Cobscook's S/J Opposition/Marine at 12, the court has been provided a copy of the underlying agreement, and Marine Harvest has not protested the oversight, *see* Marine's S/J Reply/Cobscook at 2-4, I have taken it into consideration.

Agreement *other than the Assumed Liabilities*[,]" Purchase Agreement § 6.1.7 (emphasis added), and specified that the liabilities the purchasers agreed to assumed as of December 15, 2005, included "*all* costs and liabilities" regarding the transferred employees, Marine's SMF ¶ 50; Purchase Agreement § 4.1 (emphasis added).

In short, the purchasers, including Horton's, now True North, agreed to assume as of December 15, 2005, all liabilities regarding the transferred employees, whether those liabilities were then accrued or contingent or known or unknown, and agreed to raise any issues regarding seller representations and warranties as to those transferred employees by December 15, 2007. No such issue was timely raised.  The Purchase Agreement hence affords True North no right to indemnification or contribution against Marine Harvest.

In any event, as Marine Harvest points out, *see* Marine's S/J Motion/Cobscook at 9, True North is barred from seeking indemnification or contribution from Marine Harvest in this action by virtue of a settlement agreement dated November 30, 2007, in which True North agreed to release Marine Harvest from "any and all claims, actions, causes of action, debts, accounts, contracts, interest, damages, costs or expenses whatsoever, incurred prior to or in connection with the transactions contemplated by the [Purchase Agreement][,]" Marine's SMF ¶ 56; Cobscook's Opposing SMF/Marine ¶ 56.

The Cobscook Bay Defendants argue that, in releasing Marine Harvest from claims "incurred prior to or in connection with the transactions contemplated by the [Purchase Agreement][,]" True North released it only from claims *in existence* as of November 2007, which did not include the plaintiff's later-filed claims.  *See* Cobscook's S/J Opposition/Marine at 13.  As Marine Harvest rejoins, this construction flies in the face of plain language of the Settlement Release stating that the claims released included those "known or unknown, now

54

existing or arising in the future."   Marine's S/J Reply/Cobscook at 4;  Marine's Reply SMF/Cobscook ¶ 83; Settlement Release ¶ 10.

For the foregoing reasons, Marine Harvest is entitled to summary judgment as to the Cobscook Bay Defendants' cross-claims against it.

### E.  Cobscook's S/J Motion

### 1.  Factual Background

The Cobscook Bay Defendants' and the plaintiff's statements of material facts, credited to the extent either admitted or supported by record citations in accordance with Local Rule 56, with disputes in cognizable facts resolved in favor of the plaintiff as nonmovant, reveal the following relevant facts.

Cobscook Bay, formerly known as Stolt Sea Farm Maine, Inc., *i.e.*, SSF Maine, and International Aqua Foods USA, Inc., is a Maine corporation.  Defendants Cobscook Bay Salmon, True North Salmon US, Inc., Phoenix Salmon US, Inc., and New DHC, Inc.'s Statement of Material Facts ("Cobscook's SMF") (Docket No. 56) ¶ 1; Plaintiff's Opposing Statement of Material Facts ("Plaintiff's Opposing SMF/Cobscook") (Docket No. 64) ¶ 1.[48]  True North is a Maine corporation formerly known as Cooke Aquaculture US, Inc., *i.e.*, Cooke.  *Id.* ¶ 2.  Phoenix is a Maine corporation and a subsidiary of True North.  *Id.* ¶ 3.  DHC is a Maine corporation.  *Id.* ¶ 4.

The plaintiff is a resident of Lubec, Washington County, Maine, and at all times relevant to this action was a member of the crew of the F/V *Jocelyn Marie*.  *Id.* ¶ 5.  The plaintiff began working for SSF, also known as Marine Harvest, in 1996.  *Id.* ¶ 6.  In December 2005, SSF,

---

[48] The plaintiff qualifies this statement, asserting that Cobscook Bay is a Maine corporation and is the same corporate entity that prior to October 23, 2006, was known as Stolt Sea Farm, Maine, Inc., *i.e.*, SSF Maine. Plaintiff's Opposing SMF/Cobscook ¶ 1; Cobscook Admissions ¶ 8.

under its new corporate name of Marine Harvest, along with Marine Harvest Canada, Inc., transferred certain interests identified in a Purchase Agreement dated November 2005 to Horton's. *Id*. ¶ 7. Pursuant to the Purchase Agreement, True North acquired a number of employees from SSF, including the plaintiff. *Id*. ¶ 8. True North owns 100 percent of the shares of defendant Cobscook Bay. *Id*. Phoenix, the plaintiff's current employer, is also a wholly owned subsidiary of True North. *Id*.[49]

Until being promoted to his current position as captain of the barge *Jocelyn Marie*, the plaintiff worked as a deckhand on that vessel. *Id*. ¶ 9. In August 2005, he was a full-time deckhand on the barge, the *Jocelyn Marie*. *Id*. ¶ 10. The plaintiff alleges that, on or about August 31, 2005, he suffered injuries while "dipping" salmon. *Id*. ¶ 11. He describes the task of dipping fish as one in which he was standing on a three-pipe cage with the salmon in the cage, dipping the net into the cage, pulling the net up with salmon in it, and lifting the net to a man standing on the barge. *Id*. ¶ 12. He was dipping fish to obtain a fish sample for an expected future harvest. *Id*. ¶ 13.

The plaintiff woke at 1 a.m. the day following his fish-dipping activity with pain in his buttocks and leg. *Id*. ¶ 15. He mentioned to his supervisor the following day that he was sore, but did not mention that he hurt himself at work the previous day while dipping fish. *Id*. ¶ 16. It was not until nearly six months later that he underwent an MRI scan of his back. *Id*. ¶ 17. In February 2006, following the MRI, the plaintiff told his supervisor that he had a herniated disk, but did not tell him that he believed it to be the result of dipping fish. *Id*. ¶ 18.

---

[49] The plaintiff qualifies paragraph 8, stating that in 2005, when the Purchase Agreement was signed, he was employed by SSF Maine, and he did not become an employee of True North. *See* Plaintiff's Opposing SMF/Cobscook ¶ 8; Cobscook Admissions ¶ 1.

During the summer of 2005, at the same time that the plaintiff claims to have sustained a back injury, he performed all of the physical labor associated with his lawn care business, which included mowing lawns, snow plowing, cutting trees, splitting wood, weed whacking, and bush hogging. *Id*. ¶ 19.[50] The plaintiff mows lawns for about 20 people. *Id*. ¶ 20. He has performed weed whacking as part of his business since 2001. *Id*. ¶ 21. He testified that he often worked in his lawn care business in the evenings after his work on the *Jocelyn Marie* was completed for the day. *Id*. ¶ 22. Whether he worked at his lawn care business on any particular evening depended on the season and whether there was sufficient daylight remaining for him to accomplish his intended lawn care tasks. *Id*. ¶ 23. The plaintiff recorded his work hours in a daily planner. *Id*. ¶ 24.[51]

The plaintiff asked Dr. Lauren Hebert, the recipient of a doctorate in physical therapy, to assess the work-related risk of dipping fish, whether the job was safe, and whether the plaintiff's injury was consistent with dipping fish. *Id*. ¶ 25.[52] Dr. Hebert concluded that the injury described in the plaintiff's medical reports and as explained and demonstrated to him by the plaintiff is consistent with the stress of salmon dipping. *Id*. ¶ 37. Dr. Hebert arrived at this conclusion by putting weights and angles shown to him by the plaintiff into a formula, the mathematics of which he himself does not understand, and by considering other risk factors that he admitted he could not quantify, such as the plaintiff's clothing on the day of the salmon dipping demonstration. *Id*. ¶ 38.[53]

---

[50] The plaintiff qualifies this statement, noting that he did not testify that he plowed snow in the summer of 2005. *See* Plaintiff's Opposing SMF/Cobscook ¶ 19; Deposition of Jonathan Marzoll ("Marzoll Dep."), attached to Cobscook's SMF, at 89, 92.

[51] My recitation incorporates the plaintiff's qualification.

[52] My recitation incorporates the plaintiff's qualification.

[53] The plaintiff qualifies this statement, asserting that Dr. Hebert performed his normal evaluation routine, one that he teaches, and that he interviewed the plaintiff, observed the work task, took photographs, took measurements, used the NIOSH Lifting Equation and the WISHA Lifting Analysis and evaluated risk factors not considered in those *(continued on next page)*

Dr. Hebert admits that, if the plaintiff was engaged in other activities that are equally unsafe, he could not determine whether the job-related task was the source of the injury or the other sources. *Id.* ¶ 39. Dr. Hebert admits that off-the-job factors can play a role in causing back pain conditions, including psychosocial factors. *Id.* ¶ 40. Dr. Hebert did not try to exclude other possible causes of the plaintiff's injury from his assessment. *Id.* ¶ 43. He did not consider the impact of other physical activities and off-the-job factors on the creation of the plaintiff's condition. *Id.* ¶ 44.[54] Dr. Hebert concerned himself exclusively with the question of whether the salmon dipping, as described to him and demonstrated by the plaintiff, had the potential to cause back injury. *Id.* ¶ 45.[55] A review of all of the workers' compensation records transferred to Horton's from SSF/Marine Harvest for the period 2000 to 2005 involving the Eastport facility reveals no reported back injuries resulting from the task of dipping salmon. Cobscook's SMF ¶ 48; Affidavit of David W. Miller ("Miller Aff."), attached thereto, ¶¶ 6-8.[56]

The plaintiff's employer in 2005 was SSF Maine. Plaintiff's Statement of Additional Facts ("Plaintiff's Additional SMF/Cobscook"), commencing on page 5 of Plaintiff's Opposing SMF/Cobscook, ¶ 49; Defendants Cobscook Bay Salmon, True North Salmon US, Inc., Phoenix

---

formulas that added risk to dipping, such as "stance stability," how accustomed the worker is to the task, and reaching far forward over a waist-high rail. *See* Plaintiff's Opposing SMF/Cobscook ¶ 38; Hebert Aff. ¶ 5.

[54] The plaintiff qualifies paragraphs 43 and 44, noting that the referenced pages indicate that Dr. Hebert did not ask the plaintiff about his job satisfaction, relations with co-workers, or happiness with life. *See* Plaintiff's Opposing SMF/Cobscook ¶¶ 43-44; Hebert Dep. at 74-77.

[55] The plaintiff qualifies this statement, asserting that Dr. Hebert also evaluated whether the job was safe and concluded that it was not. *See* Plaintiff's Opposing SMF/Cobscook ¶ 45; Hebert Aff. ¶ 2.

[56] I overrule the plaintiff's objection that David Miller lacks personal knowledge regarding the Purchase Agreement transaction and hence cannot lay a foundation that workers' compensation records were transferred incident thereto. *See* Plaintiff's Opposing SMF/Cobscook ¶ 48. The plaintiff relies on Miller's deposition testimony that he did not "know the details of the [Purchase Agreement] transaction, . . . *you know, whether it was an asset sale or what.*" Deposition of David Miller, attached to *id.*, at 21 (emphasis added). This testimony does not clearly contradict Miller's averment that statements in his affidavit regarding the *transfer of files* incident to that transaction were made on personal knowledge. *See* Miller Aff. That said, I have reworded this paragraph of Cobscook's SMF to the extent not supported by the citation given. I omit paragraphs 46 and 47 of Cobscook's SMF, *see* Cobscook's SMF ¶¶ 46-47, sustaining the plaintiff's objection that they constitute argument rather than fact, *see* Plaintiff's Opposing SMF/Cobscook ¶¶ 46-47.

Salmon US, Inc. and New DHC, Inc.'s Response to Plaintiff's Additional Statement of Material Facts ("Cobscook's Reply SMF") (Docket No. 80) ¶ 49.[57]   The plaintiff's immediate supervisor in 2005 was Steve Wallace.  *Id.* ¶ 50.  In 2005, Wallace was the primary captain of the *Jocelyn Marie*.  *Id.* ¶ 51.  Wallace's immediate supervisor in 2005 was Austin Dinsmore.  *Id.* ¶ 52.  In 2005, Wallace's employer was SSF Maine.  *Id.* ¶ 53.[58]  In 2005, Dinsmore's employer was SSF Maine.  *Id.* ¶ 54.[59]  The Maine corporation now known as Cobscook Bay is the same corporate entity that prior to October 23, 2006, was known as SSF Maine.  *Id.* ¶ 55.

The plaintiff asserts that, on the day he was injured, he was requested to dip salmon by Wallace.  *Id.* ¶ 56.[60]  Marine Harvest did not provide the plaintiff with any instructions pertaining to how to dip salmon without unreasonably risking back injury.  Plaintiff's Additional SMF/Cobscook ¶ 57; Defendant Marine Harvest USA, LLC's Answers to Plaintiff's First Set of Interrogatories ("Marine Interrog. Ans."), attached thereto, ¶ 14.  According to Dinsmore, in 2005 there was no "single method or recommended method" of dipping fish so that people did not hurt their backs.  Plaintiff's Additional SMF/Cobscook ¶ 58; Cobscook's Reply SMF ¶ 58.[61]  Dinsmore is not aware of any specific training in 2005 given to employees having to do with

---

[57] The Cobscook Bay Defendants purport to qualify this statement, admitting that the plaintiff was a "nominal" employee of SSF Maine but stating that they do not concede that he was its employee for purposes of federal maritime law.  *See* Cobscook's Reply SMF ¶ 49.  As discussed below, the Cobscook Bay Defendants previously admitted without qualification that SSF Maine was the plaintiff's employer, and that admission remains binding. The qualification is on that basis disregarded.

[58] The Cobscook Bay Defendants qualify this statement, admitting that Wallace was a "nominal" employee of SSF Maine.  *See* Cobscook's Reply SMF ¶ 53.

[59] The Cobscook Bay Defendants qualify this statement, admitting that Dinsmore was a "nominal" employee of SSFM.  *See* Cobscook's Reply SMF ¶ 54.

[60] The Cobscook Bay Defendants admit that the plaintiff so alleges but deny that dipping salmon was a cause of his injuries.  *See* Cobscook's Reply SMF ¶ 56.  However, I view the evidence in the light most favorable to the plaintiff as nonmovant.

[61] The Cobscook Bay Defendants qualify this statement, asserting that Dinsmore also testified that dipping fish for lice samples would only take a matter of minutes, and sampling for a schedule three would take half an hour to an hour.  *See* Cobscook's Reply SMF ¶ 58; Dinsmore Dep. at 24.  The Cobscook Bay Defendants further assert that Wallace stated that if the plaintiff worked on the site, then he dipped fish, and if he worked on the Jocelyn Marie, then he had done sampling.  *See* Cobscook's Reply SMF ¶ 58; Deposition of Steve Wallace ("Wallace Dep."), attached to Cobscook's Opposing SMF/Marine, at 43.

dipping fish.  *Id*. ¶ 59.[62]  According to Dinsmore, the plaintiff would not have gotten any training

in the dipping procedure with respect to avoiding back injuries.  *Id*. ¶ 60.  According to Wallace,

there were no recommendations to employees about how to dip fish to avoid hurting their backs.

*Id*. ¶ 61. Wallace never trained anyone on how to dip fish in a way that would avoid injury.  *Id*. ¶

62.  Wallace is not aware of the plaintiff receiving any training as of August 2005 regarding how

to dip fish.  *Id*. ¶ 63.

According to the plaintiff's expert, Dr. Hebert, there are things that an operator can do to

reduce the risk of injury when dipping.  *Id*. ¶ 64.[63]  In Dr. Hebert's opinion, "when one is

presented with a physical task that would appear to be physically demanding, it is best that the

employee be educated as to the best possible body mechanics to carry it out to expand their

margin of protection from injury."  *Id*. ¶ 65.  According to Dr. Hebert, to lessen the risk of injury

from dipping, the training indicated includes proper lifting technique as well as preventive

stretching.  *Id*. ¶ 66.  In Dr. Hebert's opinion, the plaintiff's employer should have provided

training for him.  Plaintiff's Additional SMF ¶ 67; Hebert Dep. at 84.[64]  The plaintiff explained

how he dipped fish to Dr. Hebert, and Dr. Hebert observed a demonstration of dipping.

Plaintiff's Additional SMF ¶ 68; Hebert Aff. ¶ 5.[65]

Maureen Graves Anderson is a certified professional ergonomist.  Plaintiff's Additional

SMF ¶ 69; Cobscook's Reply SMF ¶ 69.  Anderson was retained by Cobscook Bay "to review

---

[62] The Cobscook Bay Defendants qualify this statement as well as paragraphs 60 through 63, asserting that Wallace remembers receiving handouts on ways to avoid injuries on the job.  *See* Cobscook's Reply SMF ¶¶ 59-63; Wallace Dep. at 22-23.
[63] The Cobscook Bay Defendants qualify this statement, asserting that according to Dr. Hebert, there are things that an operator can do to increase or reduce the risk of lift, meaning, among other things, that an operator controls some of the risk associated with the task.  *See* Cobscook's Reply SMF ¶ 64; Hebert Dep. at 58.
[64] I have omitted that portion of the statement that is unsupported by the citation given, sustaining in part an objection on that ground by the Cobscook Bay Defendants.  *See* Cobscook's Reply SMF ¶ 67.
[65] The Cobscook Bay Defendants purport to qualify this statement, but their qualification is unsupported by any record citation and is in the nature of argument.  *See* Cobscook's Reply SMF ¶ 68.  On those bases, it is disregarded.

and evaluate the opinions of Lauren Hebert and to perform an independent evaluation of the dip netting task described by Plaintiff[.]"  *Id*. ¶ 70.[66]  In her report, Anderson recommended that "[f]urther analysis should be done to re-engineer the dip-netting task and to develop a training program for the dip-netting task."  *Id*. ¶ 72.[67]

By letter dated April 6, 2009, to the attorneys for the defendants in this matter, the plaintiff designated Drs. Christensen, Anson, Guernelli, and others as experts.  *Id*. ¶ 73.  In pertinent part, that designation states that these doctors "will testify consistent with their medical records and are all expected to testify that the back injury for which they treated Jonathan Marzoll was likely caused by 'fish dipping' on or about September 1, 2005 as described by Marzoll when he initially sought treatment on September 8, 2005 and as described to various medical providers thereafter."  *Id*.[68]

The plaintiff reported his injury to his doctor on September 8, 2005, and under the "subjective" section for the medical note for that day, the doctor wrote "pain mainly in SI jt radiated down to the feet.  Pt apparently bending down on the rail trying to catch fish in a net . . . [unreadable] . . . the next day pt dev sig pain."  *Id*. ¶ 74.

Keith B. Quattrocchi, M.D., a board-certified neurosurgeon, met with the plaintiff in April 2006 and took a history from him that states in pertinent part that the plaintiff "works in the fishing industry and since September has been having some fairly significant left parasagittal back pain and leg pain.  He noticed that he was leaning over a rail doing what he calls 'dipping

---

[66] The Cobscook Bay Defendants qualify this statement, asserting that Anderson's report also indicates that her purpose was to "evaluate the task of dip-netting as done by an experienced employee" and to "compare results of this analysis to a previous analysis done for [the plaintiff]."  *See* Cobscook's Reply SMF ¶ 70; Job Fit Analysis, Dip-Netting Task ("Anderson Report"), attached to Plaintiff's Opposing SMF/Cobscook, at [1].

[67] I omit paragraph 71, sustaining the Cobscook Bay Defendants' objection that it is not supported by the citation given.  *See* Cobscook's Reply SMF ¶ 71.

[68] The Cobscook Bay Defendants purport to qualify this statement, as well as paragraphs 74 through 78, 86, and 99, with observations that are in the nature of arguments and are unsupported by record citations.  *See* Cobscook's Reply SMF ¶¶ 74-78, 86, 99.  On those bases, these qualifications are disregarded.

61

fish.'  That day was particularly a difficult one, but he did not develop back pain until the next

morning."  *Id.* ¶ 75.  Dr. Quattrocchi also recorded the plaintiff's "past medical history" as being

"relatively unremarkable.  He denies myocardial infarction, stroke, diabetes, or hypertension."

*Id*.  Dr. Quattrocchi then took a family history from the plaintiff, performed a physical and

neurological evaluation and reviewed imaging studies.  *Id*.  Dr. Quattrocchi's "impression" from

this medical examination was that the plaintiff had a disk herniation, and he recommended that

he undergo a left L4-5 microdiskectomy.  *Id*.

On June 6, 2006, the plaintiff was seen by Dr. John Guernelli at the request of Dr.

Quattrocchi for "interventional physiatric consultation."  *Id*. ¶ 76.  Dr. Guernelli recorded that the

plaintiff was a "32-year old, right handed gentleman with no prior history of low back pain until

September 1, 2005 while he was at work.  He was lifting some heavy fish with a net which he

said weighed 60 to 70 pounds, he felt something funny in his back at that time but things did not

get really bad until he got home that night and definitely the[] next morning where he felt severe

low back pain radiating down the left lower extremity."  *Id*.  Dr. Guernelli described the

plaintiff's "past medical history" as "none."  *Id*.  He conducted a physical examination of the

plaintiff, reviewed x-rays that showed a disk herniation at 4-5, and reported a diagnostic

impression of "left L5 radiculopathy in the setting of a herniated nucleus pulposus that occurred

in September."  *Id*.

On October 1, 2008, the plaintiff was seen by Philip Anson, M.D., at Falmouth

Orthopaedic Center.  *Id.* ¶ 77.  Dr. Anson reported to the plaintiff's primary care physician that

the plaintiff "sustained an injury to his back in August 2005 dipping fish."  *Id*.  Dr. Anson recited

the treatment that the plaintiff had undergone since injuring his back dipping fish in August

2005, took a "past medical history" from the plaintiff, examined him, and reviewed x-ray films. *Id*.

The plaintiff did not tell his employer that he injured himself on the job because he was afraid of losing his job. *Id*. ¶ 78.[69]   On the day that the plaintiff claims that he was injured, he performed fish dipping as follows:

> He stood on a series of rounded pipes which acted as a walkway.  In front of him was a waist-high rail, and the barge was directly behind him within arm[']s reach. Using a dip net which was 5 to 6 feet long, [he] leaned over the railing and dipped salmon out of the water and then raised them above his head to the deck of the barge.  [He] typically dipped 5 to 7 salmon at a time, and each fish weighed between 8 and 10 pounds.  He performed this task for between 2 ½ and 3 hours.

*Id*. ¶ 79.[70]

In Dr. Hebert's opinion, the "injury described in the medical reports [for the plaintiff]  . . . is consistent with the stress of . . . dipping fish." *Id*. ¶ 82.   In Dr. Hebert's opinion, dipping as described by the plaintiff and as observed by Dr. Hebert "is unsafe in light of the observed risk factors and physical demands." *Id*. ¶ 83.

The only expert designated by Cobscook Bay is an ergonomist, Anderson.  *Id*. ¶ 85. None of the medical records attached as Exhibit B to Cobscook's Statement of Material Facts references any cause for the plaintiff's back injury other than dipping fish.  *Id*. ¶ 86.   No defendant in this case conducted, had conducted on its behalf, or is aware of any work task evaluations, work station evaluations, work site evaluations, or any ergonomic studies regarding the task of dipping fish and how to accomplish that task in a safe manner.  *Id*. ¶ 87.

---

[69] The Cobscook Bay Defendants qualify this statement, asserting that the plaintiff admitted that no one had ever told him that if he filed a worker's compensation claim he would lose his job.  *See* Cobscook's Reply SMF ¶ 78; Marzoll Dep. at 80.

[70] The Cobscook Bay Defendants qualify this statement, denying that dipping fish was a cause of the plaintiff's injuries.  *See* Cobscook's Reply SMF ¶ 79.  However, I view the evidence in the light most favorable to the plaintiff as nonmovant.

The plaintiff first saw his primary care physician, Dennis Lewis, about his back on September 8, 2005, and told Lewis that he had hurt his back dipping fish. *Id.* ¶ 93. The Cobscook Bay Defendants' expert ergonomist, Anderson, reviewed the medical records in Dr. Hebert's file and is of the opinion that dipping could contribute to the plaintiff's injury. Plaintiff's Additional SMF/Cobscook ¶ 94; Anderson Dep. at 85.[71] The plaintiff did not injure his back working in his lawn care business. Plaintiff's Additional SMF/Cobscook ¶ 95; Affidavit of Jonathan Marzoll, attached to Plaintiff's Opposing SMF/Cobscook, ¶ 2.[72] The plaintiff never experienced pain in his buttocks and down his leg prior to dipping fish on or about August 31, 2005. Plaintiff's Additional SMF/Cobscook ¶ 96; Cobscook's Reply SMF ¶ 96.[73]

The Cobscook Bay Defendants did not depose any of the plaintiff's treating doctors. *Id.* ¶ 97. They did not designate any experts on the issue of the cause of the plaintiff's injuries in this case. Plaintiff's Additional SMF/Cobscook ¶ 98; Affidavit of R. Terrance Duddy, attached thereto, ¶ 6.[74] To a reasonable degree of medical certainty, Philip Anson, a board-certified orthopedic surgeon who is treating the plaintiff, is of the opinion that dipping caused the plaintiff's L4-5 herniation and his continuing pain problems. Plaintiff's Additional SMF/Cobscook ¶ 99; Cobscook's Reply SMF ¶ 99.

## 2. Discussion

The Cobscook Bay Defendants move for summary judgment as to all three of the plaintiff's claims against them on the bases that (i) all three claims require proof, in varying

---

[71] I have omitted a portion of this statement that is unsupported by the citation given, sustaining in part an objection on that ground by the Cobscook Bay Defendants. *See* Cobscook's Reply SMF ¶ 94.

[72] The Cobscook Bay Defendants purport to deny this statement, *see* Cobscook's Reply SMF ¶ 95; however, their assertions are in the form of legal arguments. In any event, I view the record in the light most favorable to the plaintiff as nonmovant.

[73] The Cobscook Bay Defendants purport to qualify this statement, *see* Cobscook's Reply SMF ¶ 96; however, their assertions are in the form of legal arguments and are on that basis disregarded.

[74] The Cobscook Bay Defendants purport to deny this statement, *see* Cobscook's Reply SMF ¶ 98; however their assertion is unsupported by any record citation. On that basis, it is disregarded.

degrees, of causation, and (ii) he adduces insufficient evidence to generate a triable issue that fish dipping aboard the F/V *Jocelyn Marie* caused the back injury of which he complains. *See* Cobscook's S/J Motion at 5-16. For the reasons that follow, I conclude that the plaintiff has generated a triable causation issue with respect to each of his claims.

### a.  Standards of Causation

### i.  Jones Act

"The Jones Act provides seamen with a cause of action against employers when an employer's failure to exercise reasonable care causes a subsequent injury even where the employer's negligence did not render the ship unseaworthy." *Napier*, 454 F.3d at 67 (citation and internal quotation marks omitted). "While [a plaintiff] must establish all the elements of a common-law negligence claim, the burden to prove causation under the Jones Act is featherweight." *Id*. (citation and internal quotation marks omitted). A plaintiff "need only demonstrate that the vessel's negligence played any part, even the slightest, in producing the injuries for which the plaintiff seeks damages." *Id*. (citations and internal quotation marks omitted).[75]

---

[75] In their reply brief, the Cobscook Bay Defendants argue for the first time that a 2007 Supreme Court case, *Norfolk S. Ry. Co. v. Sorrell*, 549 U.S. 158 (2007), calls into question the First Circuit's description in *Napier* and other cases of the Jones Act burden of proving causation as "featherweight" and as requiring only a showing that negligence "played any part, even the slightest," in causing the injury. Defendants Cobscook Bay Salmon, True North Salmon US, Inc., Phoenix Salmon US, Inc., and New DHC, Inc.'s Reply Memorandum to Plaintiff's Opposition to Defendants' Motion for Summary Judgment ("Cobscook's S/J Reply") (Docket No. 79) at 1-5. This point not only was raised for the first time in a reply memorandum, counseling its disregard, *see, e.g., In re One Bancorp Sec. Litig*., 134 F.R.D. 4, 10 n.5 (D. Me. 1991) (court generally will not address an argument advanced for the first time in a reply memorandum), but also represents a turnabout from the Cobscook Bay Defendants' statement in their motion that "[u]nder the [Jones] Act, evidence that an employer's negligence played 'any part, even the slightest,' in causing an employee's injury will serve to make the negligence actionable," Cobscook's S/J Motion at 5 (citations omitted). In any event, assuming *arguendo* that it is appropriate to consider the merits of the argument, it is unpersuasive. The Court was clear in *Sorrell*, a FELA case, that the question presented was whether the *same* causation instruction must be given with respect to both a railroad's negligence and an employee's contributory negligence. *See Sorrell*, 549 U.S. at 164-65. It expressly declined to address the question of what the substantive content of that instruction must be. *See id*. (declining to rule on "the issue of the substantive content of the causation standard" for railroad liability, an issue "significant enough that we prefer not to address it when it has *(continued on next page)*

### ii. Unseaworthiness

"Liability based upon a claim of unseaworthiness does not require a showing of negligence, but instead imposes a strict liability regime upon shipowners." *Id*. "For liability to exist, a plaintiff must first establish the existence of an unseaworthy condition on board the vessel and then demonstrate the unseaworthy condition to be the proximate cause of his injury." *Id*. "Proximate cause requires that the unseaworthy condition is the cause which in the natural and continuous sequence, unbroken by any efficient intervening cause, produces the results complained of, and without which it would not have occurred." *Id*. (citation and internal quotation marks omitted). *See also, e.g., Gifford v. American Canadian Caribbean Line, Inc*., 276 F.3d 80, 83 (1st Cir. 2002) ("To prove an unseaworthiness claim, a plaintiff must show that the unseaworthy condition of the vessel was the substantial and direct or proximate cause of the plaintiff's injuries.") (citation and internal quotation marks omitted).

### iii. Maintenance and Cure

A seaman is entitled to recover the costs of medical treatment, together with a daily subsistence payment, from the owner of a vessel on which he works if he can show that he was injured while "in service of the ship." *See, e.g., Napier*, 454 F.3d at 64 n.1.

### b. Plaintiff's Showing on Causation

The Cobscook Bay Defendants contend that the plaintiff has failed to generate a triable issue as to causation with respect to any of his three claims, in that:

1.    Given the complex nature of the claimed injury, expert testimony is required to establish causation. *See* Cobscook's S/J Motion at 7-8; *see also, e.g., Claar v. Burlington N. R.R. Co*., 29 F.3d 499, 503-04 (9th Cir. 1994) (lower court properly determined that plaintiffs

---

not been fully presented"). In the absence of a ruling by the First Circuit altering its interpretation of the Jones Act on the strength of *Sorrell*, the standard set forth in *Napier* remains binding on this court.

could not prove that chemical exposure caused their injuries for purposes of FELA claim, which requires showing that defendant's negligence "played any part, even the slightest, in producing the injury," after the court properly excluded their experts' testimony on causation) (citation and internal quotation marks omitted); *Clark v. Cobb*, No. 2:06cv179, 2006 WL 6198463, at *4 (E.D. Va. Oct. 20, 2006) ("where the injury is complicated, such as a back injury, expert medical testimony on the issue of causation must be provided to support a jury award") (citation and internal quotation marks omitted).

2.      Grant of the Cobscook Bay Defendants' motion to exclude Dr. Hebert's testimony would deprive the plaintiff of any expert testimony on causation, undermining his ability to prove even the slight degree of causation required for purposes of the Jones Act.  *See* Cobscook's S/J Motion at 8-9.  The plaintiff's medical providers did nothing more than take the his statements regarding causation at face value, performing no independent investigation into the matter.  *See id*.  The plaintiff's testimony, standing alone, is insufficient to present the issue of legal causation to a jury.  *See id*. at 9.

3.      Even if the motion to exclude Dr. Hebert's testimony is denied, the plaintiff is unable to make an adequate showing on causation as to any of his claims, even the less onerous showing required in the Jones Act context.  *See id*. at 9-10.  Dr. Hebert merely opines that fish dipping, as described to him by the plaintiff, creates a potential risk for back injury.  *See id*. at 10.  He does not say, nor can he, that fish dipping probably played a role, even in the slightest degree, in causing the plaintiff's back problem.  *See id*.  Dr. Hebert's testimony, at most, is evidence of a *possible* link between fish dipping and the reported back condition.  *See id*.  The mere possibility of a causal connection between fish dipping and the plaintiff's back problem is legally insufficient to deliver the case to the jury.  *See id*.

4.      Dr. Hebert's testimony likewise falls short of demonstrating proximate cause for purposes of unseaworthiness.  *See id*. at 12.  Dr. Hebert could only calculate the risk factors of the activity as described to him by the plaintiff.  *See id*.  He was unable to exclude other potentially contributing factors, nor did he weigh those factors as part of his analysis of the case.  *See id*.  He focused solely on the question of whether fish dipping, as described and demonstrated to him by the plaintiff, had some quantifiable potential for causing back injury.  *See id*.  He admitted that other, off-the-job physical activities could have caused a role in the plaintiff's injury and that he could not say that fish dipping caused that injury.  *See id*.

5.      Finally, as to maintenance and cure, even were Dr. Hebert's testimony permitted, the jury would be obliged to speculate about the source of the injury and where it occurred.  *See id*. at 14-15.  The Cobscook Bay Defendants analogize the plaintiff's situation to that of a seaman-plaintiff who was held to have failed to carry his burden of demonstrating that he was injured while in the service of a ship when he could show only that he *might* have suffered a mosquito bite from which he contracted West Nile virus while at work.  *See id*. at 14-15; *Price v. Connolly-Pacific Co*., 162 Cal. App.4th 1210, 1216 (Cal. Ct. App. 2008).

The plaintiff rejoins that:

1.      The Cobscook Bay Defendants incorrectly state that he designated only one expert on causation, Dr. Hebert.  *See* Plaintiff's Memorandum in Opposition to Defendant Cobscook Bay Salmon, et al.'s Motion for Summary Judgment ("Plaintiff's S/J Opposition/Cobscook") (Docket No. 63) at 9.  He designated a number of his treating doctors to give expert opinions that dipping fish caused his L4-5 herniation and continuing back problems.  *See id*.  None of those doctors mentions any cause besides fish dipping.  *See id*.  Dr. Anson, a

board-certified orthopedic surgeon, offers his opinion, to a reasonable degree of medical certainty, that the plaintiff herniated his disk while dipping fish.  *See id.*

2.      The Cobscook Bay Defendants' dismissal of the plaintiff's treating providers' opinions on the ground that none of them did more than take the plaintiff's statements at face value and did not perform an independent investigation is wholly unsupported; they chose not to depose any of those treating sources and identified no expert of their own to buttress their criticisms.  *See id.* at 9-10.  In addition, their assertions reflect a misunderstanding of the law pertaining to admissibility of causation opinions of treating medical experts, in which reliance on physical examination and a patient's self-reported medical history is considered generally appropriate.  *See id.* at 10 (citing, *inter alia*, *Cooper v. Carl A. Nelson & Co.*, 211 F.3d 1008, 1020-21 (7th Cir. 2000) (treating physician's reliance on physical examination and plaintiff's self-reported history did not render causation opinion inadmissible under *Daubert*; possibility of plaintiff's condition being attributable to different factors was quite susceptible to exploration on cross-examination by opposing counsel); *Regalado v. City of Chicago*, 40 F. Supp.2d 1009, 1018-20 (N.D. Ill. 1999) (treating neurologist permitted to testify, to a reasonable degree of medical certainty, based on examination, diagnostic findings, and victim's past medical history, that blows to head could have caused stroke, even though he could not completely rule out other possible sources of trauma); *Mikus v. Norfolk & W. Ry. Co.*, 726 N.E.2d 95, 108-09 (Ill. Ct. App. 2000) (physical examination and patient history provided sufficient foundation for treating surgeon's opinion that car accident caused plaintiff's L3-L4 disk herniation)).

In response, the Cobscook Bay Defendants suggest that testimony of the plaintiff's treating physicians is inadmissible to prove causation under *Daubert* and Federal Rule of Evidence 702, asserting that "[t]aking [the plaintiff] at his word and attaching the word 'opinion'

to it is precisely the sort of uncritical, method-less testimony that the revised Rule 702 is designed to weed out." Cobscook's S/J Reply at 6 (footnote omitted).

To the extent that the Cobscook Bay Defendants seek to exclude testimony of the plaintiff's treating physicians on *Daubert* grounds, their request comes too late. By letter dated April 6, 2009, the plaintiff designated Drs. Christensen, Anson, Guernelli, and others as experts, disclosing that they were expected to testify that fish dipping was the likely cause of his back injury. *See* Plaintiff's Additional SMF/Cobscook ¶ 73; Cobscook's Reply SMF ¶ 73. *Daubert* motions were due on September 4, 2009. *See* Docket No. 46. The reply brief in which the Cobscook Bay Defendants arguably seek exclusion of that testimony was filed on October 5, 2009. *See* Docket No. 79.

In any event, assuming *arguendo* that the Cobscook Bay Defendants press a timely motion to exclude the plaintiff's treating physicians' testimony on causation, they cite no authority for the proposition that a treating physician must perform an independent investigation to be in a position to offer a reliable opinion on that issue. *See* Cobscook's S/J Motion at 8-9. As the plaintiff points out, there is caselaw to the contrary. *See* Plaintiff's S/J Opposition/Cobscook at 10-11.

The Cobscook Bay Defendants rejoin that all but one case cited by the plaintiff predates a 2000 change to Rule 702 designed to recognize heightened admissibility standards based on *Daubert* and its progeny, and the sole cited case postdating the rule change concerns Rule 703, not Rule 702. *See* Cobscook's S/J Reply at 5-6 & n.3. Yet, my research indicates that even after 2000, courts have recognized that treatment of a patient can provide an adequate foundation for the expression of an opinion on causation of a medical condition. *See, e.g., Santoro v. Signature Constr., Inc.*, No. 00 Civ. 4595(FM), 2002 WL 31059292, at *4 (S.D.N.Y. Sept. 16, 2002) ("As

numerous cases in this Circuit and elsewhere recognize, a treating physician often forms an opinion as to the cause of an injury or the extent to which it will persist in the future based upon his examination of a patient.  Recognizing this reality, even after *Daubert*, treating physicians have routinely been permitted to testify to determinations that they made in the course of providing treatment regarding the cause of an injury and its severity.") (citations omitted).

To the extent that the Cobscook Bay Defendants protest that the plaintiff's treating physicians predicated their opinions, at least in part, on the plaintiff's self-reported history, which appears to be the crux of their concern, *see* Cobscook's S/J Motion at 8-9; Cobscook's S/J Reply at 5-7, that concern can be adequately addressed through vigorous cross-examination, *see, e.g., Owen v. United States*, No. CIV 07-4014 KES, 2008 WL 5122282, at *3 (D.S.D. Dec. 5, 2008) ("Defendant's contention that Dr. Hoversten's opinion should be excluded because it is based on inaccurate factual information is unavailing.  The soundness of the factual basis for Dr. Hoversten's opinion goes to the credibility of his testimony, not its admissibility.  Defendant can bring out the inconsistencies between the facts plaintiff reported to Dr. Hoversten and the facts he reported in his deposition on cross examination.") (citations omitted).

On the strength of (i) the plaintiff's testimony concerning the manner in which he was injured, (ii) Dr. Hebert's testimony concerning the risks of the salmon-dipping job as the plaintiff testified that he performed it, and (iii) the plaintiff's treating physicians' opinions on causation, a reasonable trier of fact could find that:

1.     For purposes of the Jones Act claim, the plaintiff's employer's negligence played a role in the complained-of injuries.

2.     For purposes of the unseaworthiness claim, assuming *arguendo* that the dipping task constituted an unseaworthy condition, it proximately caused the complained-of injuries.

3.     For purposes of the maintenance and cure claim, the plaintiff was injured while in the service of the vessel.

The Cobscook Bay Defendants' bid for summary judgment on the plaintiff's claims accordingly should be denied.

### III.  Conclusion

For the foregoing reasons, I ***DENY*** the Cobscook Bay Defendants' motion to exclude Dr. Hebert's testimony and recommend that the court (i) ***GRANT*** the plaintiff's motion for partial summary judgment, (ii) ***GRANT*** Marine Harvest's motion for summary judgment as to the plaintiff's Jones Act and maintenance and cure claims, but ***DENY*** it as to the plaintiff's unseaworthiness claim, (iii) ***GRANT*** Marine Harvest's motion for summary judgment as to the Cobscook Bay Defendants' cross-claims, and (iv) ***DENY*** the Cobscook Bay Defendants' motion for summary judgment as to the plaintiff's claims.

### ***NOTICE***

*A party may file objections to those specified portions of a magistrate judge's report or proposed findings or recommended decisions entered pursuant to 28 U.S.C. § 636(b)(1)(B) for which de novo review by the district court is sought, together with a supporting memorandum, within ten (10) days after being served with a copy thereof.  A responsive memorandum shall be filed within ten (10) days after the filing of the objection.*

*Failure to file a timely objection shall constitute a waiver of the right to de novo review by the district court and to appeal the district court's order.*

Dated this 29th day of November, 2009.

/s/  John H. Rich III
John H. Rich III
United States Magistrate Judge